FILED

07/05/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0609

DA 20-0609

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 129

ARIANE WITTMAN and JEREMY TAYLEN,

      Plaintiffs and Appellants,

    v.

CITY OF BILLINGS,

      Defendant and Appellee.

APPEAL FROM:     District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 19-1124
Honorable Michael G. Moses, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

          Tucker P. Gannett (argued), Amanda Beckers Sowden, Gannett Sowden
Law, PLLC, Billings, Montana

      For Appellee:

          Gerry P. Fagan (argued), Afton E. Ball, Moulton Bellingham, PC, Billings,
Montana

      For Amicus Montana Trial Lawyers Association:

          Raphael Graybill (argued), Graybill Law Firm, P.C., Great Falls, Montana

Argued and Submitted: September 10, 2021

Decided: July 5, 2022

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Ariane Wittman and Jeremy Taylen (collectively "Wittmans") appeal the Thirteenth Judicial District Court's memorandum and order (Order) denying their motion for partial summary judgment and dismissing their inverse condemnation claim against the City of Billings (City). We affirm.

*Did the District Court err by entering summary judgment in favor of the City on Wittmans' inverse condemnation claim?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 The Wittmans own and reside in a home located within the City of Billings. Pursuant to City regulations, their home is attached to the City's public sewer system. On June 20, 2019, calamity struck when a grease clog in the City's sewer main caused 1,000 gallons of raw sewage to back up into the Wittmans' basement, an event known in official vernacular as a Sanitary Sewer Overflow (SSO). To recover their damages, the Wittmans filed suit against the City, proceeding on a singular theory of inverse condemnation.

¶3 Discovery revealed that grease accumulation in public sewer systems is a common issue that occurs when users improperly dispose grease-based material in the system. A City expert witness stated that "sewer systems are designed to basically put down toilet paper, fecal matter, and urine . . . . [But] [p]eople treat their sewer systems as trash cans." The City has enacted ordinances regulating the disposal of grease by industrial users, who are the potentially significant offenders, although no such regulations exist for residential users. As a City witness explained, municipalities "can do virtually nothing" to preempt residents from discharging grease into the system. The grease "collects on pipe walls,

2

and . . . keeps collecting until it eventually chokes off the pipe . . . flow," which occurs "no matter what type of pipe" is used. The City annually cleans all 500-plus miles of its sewer system under a program the Wittmans acknowledge is "robust" and more thorough than those implemented by other major Montana municipalities. Despite this effort, the City experiences ten to fifteen SSOs annually, affecting about 0.04687 percent of those connected to the system. During oral argument, the City explained that not all of these SSOs are caused by grease accumulation. Tree roots entering the sewer system and the accumulation of other debris also cause SSOs and contribute to the problem.

¶4 The Wittmans moved for summary judgment on liability, arguing that "grease accumulating in public sewer mains is an inherent and inescapable consequence of operating public sewers" and therefore, as a matter of law, their home had been damaged for public use without just compensation. The District Court denied the Wittmans' motion and ruled in favor of the City, concluding that:

> Inverse condemnation requires deliberate affirmative action by the municipality to take the property. Thus, the government cannot accidentally, inadvertently, or erroneously assert the power of eminent domain for public use. Plaintiffs fail to establish the City's deliberate actions caused the damage through preventative maintenance of the sewer lines and the nature of the . . . system.

Because the Wittmans did not establish that their damage was caused by the deliberate actions of the City, the District Court dismissed their inverse condemnation claim, and, because it was their sole claim, the entire suit.

**STANDARD OF REVIEW**

¶5     "We review de novo a district court's grant or denial of summary judgment." *Brishka v. State*, 2021 MT 129, ¶ 9, 404 Mont. 228, 487 P.3d 771 (citing *Crane Creek Ranch, Inc. v. Cresap*, 2004 MT 351, ¶ 8, 324 Mont. 366, 103 P.3d 535). "Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Brishka*, ¶ 9 (citing *Borges v. Missoula Cty. Sheriff's Office*, 2018 MT 14, ¶ 16, 390 Mont. 161, 415 P.3d 976). "The district court's conclusion that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law is a conclusion of law which we review for correctness." *Krajacich v. Great Falls Clinic, LLP*, 2012 MT 82, ¶ 8, 364 Mont. 455, 276 P.3d 922 (quoting *Hinderman v. Krivor*, 2010 MT 230, ¶ 13, 358 Mont. 111, 244 P.3d 306).

**DISCUSSION**

¶6     At the core of the arguments made in this case is the nature of Montana inverse condemnation, the only basis upon which the Wittmans seek to hold the City responsible for their damages. The question is whether the sewer backup into Wittmans' basement constitutes a constitutional damaging of Wittmans' property under the law of inverse condemnation for which the City is liable.

¶7     Wittmans first argue the District Court's ruling "demonstrates a fundamental misapprehension" of "the distinction between the affirmative (legislative) exercise of the power of eminent domain and the passive taking or damaging of property incident to governmental takings." Wittmans argue that eminent domain and inverse condemnation

4

are distinct theories that permit recovery under the application of differing standards. According to their argument, while eminent domain requires a showing of deliberate or affirmative action by the government to occupy or damage the property in question, inverse condemnation permits recovery for any damage to private property, including damage they describe variously as "incidental," "inadvertent," or "passive," which results from a government project. They describe Montana's inverse condemnation law as "find[ing] its corollary in strict liability." Somewhat inconsistently, Wittmans also offer the following summary construct of Montana inverse condemnation law, which they label "IC," drawn from our cases, as follows:

> From *Root-Butte*, *Less*, *Rauser*, and their significant progeny, th[e] Court can conclude that IC claims in Montana 1) allow for the recovery of sufficiently peculiar damages which are the inevitable or reasonably foreseeable consequence of governmental undertakings, and 2) there is no need for the property owner to prove negligence, intent, or other tortious conduct on the part of the condemning party to prevail on an IC claim.

¶8 Wittmans thus contend the District Court's ruling "runs contrary to well-established, century old IC law in Montana." Additionally, and perhaps despite their position that the District Court clearly departed from established principles, Wittmans and Amicus Montana Trial Lawyers Association propose that this Court adopt a new formulation, the inverse condemnation test adopted by the Supreme Court of California in *City of Oroville v. Superior Court*, 446 P.3d 304 (Cal. 2019), to provide clarity to Montana law, and because this Court "has historically relied on California precedent in advancing IC law here."

¶9 Wittmans' arguments contain an array of words and concepts that have not previously been employed in our condemnation jurisprudence, while the above-quoted

summary construct they draw from our cases omits elements we have applied. This is not a criticism; we have recognized this area of the law is complex and challenging to apply. *See Kafka v. Mont. Dep't of Fish, Wildlife & Parks*, 2008 MT 460, ¶ 102, 348 Mont. 80, 201 P.3d 8 (Nelson, J., dissenting) ("Takings jurisprudence itself is 'a confused body of law containing contradictory principles and standards.'") (quoting John D. Echeverria & Sharon Dennis, *The Takings Issue and the Due Process Clause: A Way Out of a Doctrinal Confusion*, 17 Vt. L. Rev. 695, 696 (1993)). But words are important, and the choice of them is critical in the application of condemnation law. We believe that, overall, there has been conceptual consistency in our long precedent in this area, and we endeavor here to add no more criteria; rather, we attempt to bring further clarity to existing precedent by reducing emphasis on one particular term that could, in isolation, be misleading and raise the bar for inverse condemnation claims higher than required by our jurisprudence as a whole. We begin by addressing Wittmans' proposal to adopt the *Oroville* formulation, and then turn to their other arguments.

¶10    *Oroville* involved a public sewer line back-up onto private property, there an office building. *Oroville*, 446 P.3d at 307. Drawing from prior holdings, the *Oroville* Court stated the test it had developed for inverse condemnation liability as follows: "the damage to private property must be substantially caused by an inherent risk presented by the deliberate design, construction, or maintenance of the public improvement," *Oroville*, 446 P.3d at 312, explaining it had replaced the previously used "proximately caused" standard with "substantially caused" in *Belair v. Riverside Cty. Flood Control Dist.*, 764 P.2d 1070

6

(Cal. 1988). *Oroville*, 446 P.3d at 311. The "proximately caused" standard had, in turn, been adopted by California in *Albers v. Cty. of L.A.*, 398 P.2d 129 (Cal. 1965), a case which this Court relied upon in *Rauser v. Toston Irrigation Dist.*, 172 Mont. 530, 537-39, 565 P.2d 632, 637-38 (Cal. 1977). In *Belair*, the California Court explained that its *Albers* decision "contained the seeds of confusion through its combination of 'proximate cause' terminology with the elimination of foreseeability as an element of inverse condemnation," a conceptual incongruity first pointed out in a 1968 law review article. *Belair*, 764 P.2d at 1074 (citing *Albers*, 398 P.2d 129); Arvo Van Alstyne, *Inverse Condemnation: Unintended Physical Damage*, 20 Hastings L.J. 431 (1968). *Albers* had held that "any actual physical injury to real property proximately caused by the improvement as deliberately designed and constructed is compensable [in an inverse condemnation action] whether foreseeable or not." *Albers*, 398 P.2d at 137. Citing the Van Alstyne article, the California Court had previously noted the *Albers* language was "potentially confusing" since "the 'proximate cause' doctrine of tort law is often defined in terms of 'foreseeability,' whereas the *Albers* decision, which imposed liability absent foreseeability, could not have intended such a construction" of the term proximate cause. *Holtz v. Superior Court of S.F.*, 475 P.2d 441, 445 n.9 (Cal. 1970). Professor Van Alstyne, endeavoring to explain in 1968 the particular meaning that "proximate cause" must hold in the context of California inverse condemnation law, observed: "[T]he language of several opinions suggests that [proximate cause in the context of inverse condemnation without fault] requires a convincing showing

7

of a 'substantial' cause-and-effect relationship which excluded the probability that other forces alone produced the injury." Van Alstyne, *supra*, at 436.

¶11 Importantly, the California Court, in adopting Professor Van Alstyne's analysis, did not reason that employing the concept of "substantially caused" was necessary to remedy any confusion that negligence concepts were being improperly applied to inverse condemnation analysis, *see Belair*, 764 P.2d at 1074-75, but, rather, that the change was necessary to resolve confusion stemming from the apparent paradox its *Albers* decision created: that a plaintiff can succeed on an inverse condemnation claim even if the physical damage to property was not "foreseeable" so long as it was "proximately caused"—a concept that necessarily involves a foreseeability analysis—by the public improvement. *See Oroville*, 446 P.3d at 311; *Belair*, 764 P.2d at 1074-75; *Holtz*, 475 P.2d at 445 n.9.

¶12 In contrast, it is apparent this Court was long ago aware of the paradox identified by Professor Van Alstyne and recognized by the California Supreme Court in *Holtz*, *Belair*, and ultimately *Oroville*, leading to that Court's reformulation of its inverse condemnation test. Despite drawing from *Albers* in our *Rauser* opinion, we did *not* take from *Albers* its premise that a plaintiff can recover in an inverse condemnation action even if the physical damage caused by the improvement was not foreseeable. *Compare Rauser*, 172 Mont. at 538-39, 565 P.2d at 637-38, *with Albers*, 398 P.2d at 137. Indeed, in *Rauser* we cited to Professor Van Alstyne's article, evidencing that our use of "proximate cause" with a requirement of foreseeability was reasoned and intentional. *See Rauser*, 172 Mont. at 538, 565 P.2d at 637. The Wittmans' briefing is explicit on the point that "foreseeability" is

8

and has always been an essential part of Montana inverse condemnation law, that *Rauser* established that inverse condemnation damages must be foreseeable, and that, congruently, the damages they allege here were foreseeable and foreseen by the City. As we have made clear, "the analysis of proximate cause in the context of an inverse condemnation claim is indistinguishable from the analysis of proximate cause in the context of a negligence claim." *Brishka*, ¶ 15 (citing *Dvorak v. Matador Serv., Inc.*, 223 Mont. 98, 106, 727 P.2d 1306, 1311 (1986)). This common requirement of establishing causation in an inverse condemnation action is distinguished from other negligence concepts, such as duty and breach, which need not be established. *Brishka*, ¶ 13. Thus, it is evident the California Supreme Court adopted the "substantially caused" standard to remedy confusion in its own case precedent that does not exist in ours. For these reasons, and because the issue of whether a plaintiff may recover on an inverse condemnation claim where the damages are *unforeseen* is not raised in this litigation, we decline to depart from our precedent to adopt *Oroville's* "substantially caused" language, as well as the remainder of California's inverse condemnation test.[1] Wittmans' remaining arguments challenge other aspects of the law of condemnation.

---

[1] Not argued in this case is whether the causation element itself within inverse condemnation should be revisited and/or revised in light of developments in general tort law, such as this Court's decision in *Busta v. Columbus Hospital*, 276 Mont. 342, 916 P.2d 122 (1996); *see Dissent*, ¶¶ 54-58. Because this issue, which requires analytical precision, was not raised and argued here, we decline to address it until a case provides proper argument to the Court.

9

*Eminent Domain and Inverse Condemnation*

¶13 Wittmans argue the District Court failed to apprehend a distinction between eminent domain and inverse condemnation. They argue that "at no point during the briefing or argument [before the District Court] did Plaintiffs/Appellants suggest that the City had asserted 'the power of eminent domain' against them." Because the City did not affirmatively initiate an eminent domain proceeding to condemn their property, they contend no affirmative intention or purpose of the City needs to be demonstrated, but, rather, it is enough for Wittmans to prove the City's sewer system caused incidental, inadvertent, or consequential damage to their property, even "passively" damaged them, in order to recover, a theorem they correlate to strict liability. The City responds to this argument by swinging for the fences, arguing that inverse condemnation is indeed premised upon the power of eminent domain, and that if Wittmans' claim does not lie in eminent domain, there is no condemnation claim at all, noting our holding in *State by Dep't of Highways v. Helena*, 193 Mont. 441, 445-46, 632 P.2d 332, 335 (1981), that "reasonable burden[s]" upon private property "directly connected with matters of public health, safety and welfare" may be imposed by the state without compensation, and are distinguished from property taken for public use by "an exercise of the eminent domain power."

¶14 Article II, Section 29, of the Montana Constitution, entitled Eminent Domain, provides that "[p]rivate property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner." Wittmans correctly state that the power to take or damage private property

10

does not originate in the Constitution, but is an attribute of sovereignty. "Eminent domain . . . derives from the power of sovereignty. Eminent domain is the right of the state to take private property for public use." *Montana Talc Co. v. Cyprus Mines Corp.*, 229 Mont. 491, 501, 748 P.2d 444, 450 (1987) (citing § 70-30-101, MCA). The Supreme Court of Oregon has noted that a "taking" of property "is a shorthand description for an exercise of the government's power of eminent domain, *which is the power of the sovereign* to take property for 'public use' without the property's owner's consent." *Dunn v. City of Milwaukie*, 328 P.3d 1261, 1266 (Or. 2014) (Applying Oregon's "taking or damaging" constitutional eminent domain provision in an inverse condemnation case.) (emphasis added). We recently stated, "[a] government taking of property is not in and of itself unconstitutional; it must simply be compensated . . . . [T]he remedy for a property owner who challenges such action may be 'just compensation.'" *Cottonwood Envtl. Law Ctr. v. Knudsen*, 2022 MT 49, ¶ 20, 408 Mont. 57, 54, 505 P.3d 837, 841 (citing *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538, 125 S. Ct. 2074, 2081 (2005), and *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030, 112 S. Ct. 2886, 2901 (1992)). Thus, while eminent domain does not originate in the Constitution, Section 29, like its Fifth Amendment counterpart in the U.S. Constitution, is the source of the property owner's right to receive just compensation from the government when property is taken, or damaged, for a public use. Section 29 secures the right of just compensation when the government initiates proceedings to condemn private property, and also secures the right in cases where the

property owner who suffers damage "inversely" initiates the condemnation proceeding against the government. As explained by the Supreme Court of Oregon in *Dunn*:

> Typically, government exercises its eminent domain power by initiating a condemnation proceeding and, through that proceeding, compensating a property owner before appropriating property for a public purpose . . . . But the power of eminent domain can be exercised *de facto* as well as well as *de jure*, which occurs when the government takes property interests through its actions without first initiating condemnation proceedings. When that happens, the property owner can bring an inverse condemnation action to obtain the just compensation.

*Dunn*, 328 P.3d at 1266 (internal citations omitted; emphasis in original). "Such a suit is 'inverse' because it is brought by the affected owner, not by the condemnor. The owner's right to bring such a suit derives from the self-executing character of the constitutional provision with respect to condemnation." *Wohl v. City of Missoula*, 2013 MT 46, ¶ 55, 369 Mont. 108, 300 P.3d 1119 (quoting *Kirby Forest Indus., v. U.S.*, 467 U.S. 1, 5 n.6, 104 S. Ct. 2187, 2191 n.6 (1984) (internal citation omitted); *see also Less v. Butte*, 28 Mont. 27, 33, 72 P. 140, 141 (1903) (holding the predecessor eminent domain provision in the 1889 Montana Constitution "is self-executing, and requires no legislation to rouse it from dormancy."). In *Less*, an inverse condemnation case, we explained that the predecessor provision was "both mandatory and prohibitory," and reasoned that "[i]t seems very clear to us that this section was drafted in the broad language stated for the express purpose of preventing an unjust or arbitrary exercise of the power of eminent domain." *Less*, 28 Mont. at 31-32, 33, 72 P. at 141. Thus, the authority for inverse condemnation is the same as for direct condemnation, and there is no basis in the text of Section 29 to conclude that the standards to obtain just compensation differ depending upon which party initiates the

12

proceeding. "[T]he test for inverse condemnation must be evaluated within the context of Article II, Section 29 of the Montana Constitution." *Deschner v. State*, 2017 MT 37, ¶ 17, 386 Mont. 342, 390 P.3d 152. Then, as specifically relevant to this case, the "or damaged" language of Section 29 and its similar predecessor provision in the 1889 Constitution have long been held to grant an owner the right to receive compensation for property damaged by the State's public use of it, even if not entirely "taken" by the State. *See generally Root v. Butte, A. & P. Ry.*, 20 Mont. 354, 51 P. 155 (1897); *Less*, 28 Mont. 27, 72 P. 140.[2]

*For Public Use*

¶15    Based upon their argument distinguishing eminent domain and inverse condemnation, Wittmans assert they need only prove their property was inadvertently or incidentally damaged by the City's sewer system to permit recovery in inverse condemnation. However, their arguments fail to incorporate the necessity of proving the constitutional premise of condemnation litigation: that the government acted to take or damage their property "for public use." Mont. Const. art. II, § 29.[3]

---

[2] The relevant language of this constitutional provision remained the same under both the 1889 and 1972 Montana Constitutions. *See Root*, 20 Mont. at 358, 51 P. at 156; *Less*, 28 Mont. at 31, 72 P. at 141.

[3] Citing *Less*, Wittmans contend that, "[t]he homeowner could thus recover for the City 'inadvertently' damaging his property by dropping the grade of the street," and citing *Knight v. City of Billings*, 197 Mont. 165, 642 P.2d 141 (1982), they contend that "incidental . . . harms occasioned by public undertakings are compensable for affected private property owners." However, *Less* did not hold that "inadvertent" damage was recoverable, or use that term in the opinion. Likewise, *Knight-Billings* did not hold that "incidental" damage was recoverable, or use that term.

13

¶16 Wittmans emphasize our holdings that an inverse condemnation claim does not require proof of negligence by the government, but this proposition is correct only because, in such actions, it must instead be proven that the government acted to take or damage property for public use. "Where, as here, the damages are known or knowable and are an inevitable result of the intentional undertaking of the project, there is no need to show negligent design, construction or operation." *Rauser*, 172 Mont. at 538, 565 P.2d at 637. "Montana's case law [on inverse condemnation] does not require a showing of negligence or a theory of negligence when faced with deliberate or intentional acts." *Deschner*, ¶ 16 (quoting *Rauser*, 172 Mont. at 537, 565 P.2d at 637). "The damages that may have been caused by a potential inverse condemnation are indistinct from the damages that may have been cause by any potential negligence on the part of the State. The distinction between the two claims lies in the basis for imputing liability to the State." *Deschner*, ¶ 19. Consequently, "[t]he initial question in an inverse condemnation case is not whether the actions of the governmental entity were the proximate cause of the plaintiff's damages. Instead, the initial question is whether the government entity's actions constituted the taking or damaging of property for public use." *Henderson v. City of Columbus*, 827 N.W.2d 486, 492 (Neb. 2013).

¶17 Our case precedent explains the necessary showing of "for public use." In *Rauser*, we explained that, "[i]t is enough to show the damages were proximately caused by the undertaking of the project and *a reasonabl[y] foreseeable consequence of the*

14

*undertaking.*" *Rauser*, 172 Mont. at 538, 565 P.2d at 637 (emphasis added).[4] Citing *Rauser*, we thereafter held that "[a] property owner may recover in an inverse condemnation action where actual physical damage is proximately caused to his property *by a public improvement as deliberately planned and built*." *Knight v. Missoula*, 252 Mont. 232, 243, 827 P.2d 1270, 1276 (1992) (citing *Rauser*, 172 Mont. 530, 565 P.2d 632) (emphasis added). Citing *Rauser* and *Knight*, we explained in *Deschner* that "the elements a plaintiff must prove in an inverse condemnation claim are (1) that the public improvement was *deliberately planned and built*; and (2) that, *as planned and built,* the public improvement proximately caused damage to the plaintiff's property." *Deschner* ¶ 22 (emphasis added); *see also Brishka*, ¶ 13.

¶18 Wittmans' and Amicus Montana Trial Lawyers Association's briefing assumes, under the first part of the *Deschner* formulation, that by simply undertaking to construct a public utility or improvement, a government entity necessarily "deliberately plan[s] and build[s]" it. However, it is evident that all public projects and improvements are "deliberately" planned and built in the sense that the municipality intended the improvement's construction—public improvements do not randomly appear without deliberate action. Consequently, under Wittmans' interpretation, "deliberately" adds nothing to the phrase "planned and built," and is rendered meaningless. However, the word

---

[4] The City correctly argues about *Rauser*, "[c]rucially, however, the Court did not decide the government was liable for inverse condemnation simply because it built a project that caused property damage."

15

is not meaningless, particularly as it is read with second part, "*that, as planned and built . . . .*" Implicit in the formulation is requisite foreseeability; that is, from the project's deliberate design and construction, damage to private property was foreseeable, and, as designed and constructed, did cause damage to the property. *See Deschner*, ¶ 22; *Rauser*, 172 Mont. at 538-39, 565 P.2d at 637-38 (property damage must be "a reasonabl[y] foreseeable consequence of the undertaking," or, the damage was "proximately caused to [the] property by a public improvement as deliberately planned and built." citing *Albers*, 398 P.2d at 136.).

¶19     We pause here to note the repeated use of the term "inevitable" damage within the *Rauser* opinion. *Rauser*, 172 Mont. at 538, 565 P.2d at 637. The *Rauser* plaintiffs alleged the construction of an irrigation project caused permanent damage to their property, and introduced evidence that the defendant irrigation district, prior to construction of the project, had received a report predicting that area flooding would result from the project— flooding which, in fact, did occur after construction. *Rauser*, 172 Mont. at 533-34, 565 P.2d at 635-36. We thus noted that, "it was inevitable that Rausers' land would be damaged by the construction of the project," and reasoned that the damages were "known or knowable and [were] an inevitable result of the intentional undertaking of the project." *Rauser*, 172 Mont. at 538, 565 P.2d at 637. The term "inevitable" has not since been applied by the Court in inverse condemnation cases, but from its use in *Rauser*, arguments have here been made that, where property damages caused by a public project are "inevitable," a condemnation claim can be sustained. To be sure, property damage shown

16

to be an inevitable consequence of a public project would clearly satisfy the public use foreseeability standards articulated above, as it did in *Rauser*. However, to the extent that "inevitable" damage provides a higher bar than "foreseeable" damage, the latter standard is sufficient. *See Rauser*, 172 Mont. at 538, 565 P.2d at 637 ("[i]t is enough to show the damages were . . . a reasonabl[y] foreseeable consequence of the undertaking.").

*Nature of the Damage*

¶20 Related to the question of whether a government entity has taken or damaged property for public use is the nature and magnitude of the alleged damage. This Court has identified this issue throughout the history of our condemnation jurisprudence.

> [I]t is doubtless true that the constitution does not authorize a remedy for every diminution in the value of property which is caused by public improvement, the damages for which compensation is to be made being a damage to the property itself, and not including mere infringement of the owner's personal pleasure or enjoyment.

*Less*, 28 Mont. at 33, 72 P. at 141-42. The *Less* Court also contrasted compensable inverse condemnation damage claims from merely those involving a "temporary spoliation or invasion of the property." *Less*, 28 Mont. at 32-34, 72 P. at 141-42.

¶21 In *Root*, addressing an inverse condemnation claim based upon environmental effects upon residential property from operating trains in the city, such as smoke, vibration, whistles, bells, engine noises, and interference with property access, we permitted the claim to proceed "for such damages as [the property owner] may have specifically sustained . . . *which are not common to the public at large.*" *Root*, 20 Mont. at 358, 51 P. at 156 (emphasis added). We explained that, generally:

17

[i]t is not a natural and a necessary result of the operation of a railroad, that, in lawfully occupying a street in a city, premises 46 feet distant from a track are damaged in any sum, for which recovery can be had, on account of the proximity of the tracks, or operation of the railroad.

*Root*, 20 Mont. at 357, 51 P. at 155; *see also Evenhus v. City of Great Falls*, No. DDV-06-900, 2012 WL 10702891 (Mont. Eight Judicial Dist. 2012) (A non-taking damaging occurs if a public improvement or use causes uncommon physical damage or impairment of a cognizable property right, where "uncommon" means "[u]ncommon to similarly situated property owners or the public at large.").

¶22    About the property damage determined to be a public use in *Rauser*, we said the government irrigation project had "caused the land to be permanently invaded," which, as alleged, "amounted to the taking of a flood easement" on the property. *Rauser*, 172 Mont. at 533, 536, 565 P.2d at 635-36. In this regard, we held, "[i]t is implicit in inverse condemnation that *the extent of the damage be of such a degree as to amount to a taking of an interest in the property damaged.*" *Rauser*, 172 Mont. at 538, 565 P.2d at 637 (emphasis added).

¶23    In *Adams v. Department of Highways*, 230 Mont. 393, 753 P.2d 846 (1988), we rejected an inverse condemnation claim by landowners premised upon the impacts to their property from the opening of the Reserve Street corridor. We stated, "[t]here is no doubt that increased traffic volume, traffic fumes, noise, dust and difficulty of ingress and egress caused inconvenience or discomfort to the property owners when the Reserve Street Bridge was opened. Nonetheless, we find these detriments to be noncompensable." *Adams*, 230 Mont. at 401, 753 P.2d at 851. We distinguished *Adams* in *Knight-Missoula*, another

18

road-based inverse condemnation claim, explaining that *Adams* "does not stand for the proposition that all takings claims arising from increased traffic and the effects thereof are to be dismissed as a matter of law," but reaffirmed *Rauser*'s holding that "the extent of damage be of such a degree" as to constitute "a taking of an interest in the property damaged." *Knight-Missoula*, 252 Mont. at 241, 243, 827 P.2d at 1275, 1276-77 (emphasis added).

¶24    Finally, as referenced above, the Court has distinguished impacts upon private property occasioned by the exercise of police power from the taking or damaging of property by the exercise of eminent domain.

> If the state action is a proper exercise of the police power and is directly connected with matters of public health, safety and welfare, a reasonable burden may be imposed upon private property without compensation . . . . On the other hand, if the state action is an exercise of the eminent domain power whereby private property is taken for a public use, just compensation is required.

*State by Dep't of Highways*, 193 Mont. at 445-46, 632 P.2d at 335 (citation omitted); *see also Yellowstone Valley Elec. Coop. v. Ostermiller*, 187 Mont. 8, 608 P.2d 491 (1980); *McTaggart v. Montana Power Co.*, 184 Mont. 329, 602 P.2d 992 (1979); and *Knight-Missoula*, 252 Mont. at 242, 827 P.2d at 1276.  In deciding these cases, the Court has assessed the extent of the benefit to public health, safety and welfare as compared to the magnitude of the interference with or impact upon private property rights.  *State by Dep't of Highways*, 193 Mont. at 447, 632 P.2d at 335-36 ("The benefit to the public as a whole outweighed the *temporary deprivation and inconvenience* suffered by the [property owner].  We find that the District Court correctly concluded that when the State required

the [property owner] to relocate its utilities, there was no taking in the constitutional sense, but rather a legitimate use of the police power for which no compensation is required.") (emphasis added).

¶25 Generally summarizing these eminent domain principles implicated by Wittmans' arguments, an inverse condemnation claim requires a plaintiff to demonstrate a public project was deliberately planned and built in such a way that the taking or damaging of private property was foreseeable, and, as planned and built, the project damaged the plaintiff's property. For a damage claim less than a complete taking, the property must have been damaged to such a degree as to constitute a permanent taking of the property, and not merely have caused an infringement upon enjoyment of the property, a temporary damage, or a damage common to the public at large.

¶26 We conclude upon the record of this case that Wittmans have not established the sewer backup was a constitutional damaging of their basement for public use, and thus, a condemnation. First, the record does not reflect that the City deliberately planned and built its sewer system in such a way that made damaging their property foreseeable. The City designed its system to accomplish disposal of "toilet paper, fecal matter, and urine," not to accommodate the improper disposal of other products; indeed, no sewer system is capable of such accommodation. Secondly, the system, "as planned and built," did not proximately cause the damage to Wittmans' property. *Deschner* ¶ 22. Rather, this backup was caused by misuse of the system.

¶27 Nor is an inverse condemnation claim established by a statistical possibility that the Wittmans could have sustained damage from the system. That 0.04687 percent of sewer users across the City experience some form of an SSO in a given year—from all causes—does not render the Wittmans' backup foreseeable. Rather, the damage sustained from the backup is properly considered an incidental or inadvertent consequence of the operation of the system. As the District Court reasoned, "the government cannot accidentally, inadvertently, or erroneously assert the power of eminent domain for public use." Further, we cannot conclude that "the extent of the damage [was] of such a degree as to amount to a taking of an interest in the property damaged." *Rauser*, 172 Mont. at 538, 565 P.2d at 637. The damage here was more akin to a "temporary spoliation or invasion of the property," *Less*, 28 Mont. at 32, 72 P. at 141, though we do not categorically hold that temporary invasions cannot sustain a condemnation claim. *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 36, 133 S. Ct. 511, 521 (2012) (rejecting a categorical bar of takings claims based upon temporary flooding, and stating, "[t]o reject a categorical bar to temporary-flooding takings claims, however, is scarcely to credit all, or even many, such claims. It is of course incumbent on courts to weigh carefully the relevant factors and circumstances in each case . . . .").

¶28 The lack of foreseeability here is illustrated by contrasting this matter with our previous cases involving inverse condemnation. In *Knight v. Billings* we concluded that the City inversely condemned properties when it significantly expanded and altered a road so as to accommodate substantially more traffic. *Knight-Billings*, 197 Mont. at 169-70,

21

174, 642 P.2d at 143, 145-46. There, the City designed and built the road expansion with the intention for it to carry more traffic. The decreased property value damages the plaintiffs asserted—lack of free access to driveways, increased vehicular pollution and noise, and dangerous sidewalk conditions due to greater proximity to traffic—were the foreseeable consequences of enlarging a residential road to carry more traffic. *Knight-Billings*, 197 Mont. at 173-74, 642 P.2d at 145-46. Indeed, the City initiated a condemnation proceeding for the property on the other side of the road, a unique fact that the Court cited to "caution that this holding is limited to the situation here." *Knight-Billings*, 197 Mont. at 173-74, 642 P.2d at 145-46. In *Rauser*, the State designed an irrigation system that would foreseeably, and there inevitably, result in the plaintiffs' property flooding, declining to alter the design before proceeding. *Rauser*, 172 Mont. at 533-34, 565 P.2d at 635. And in *Less*, the deliberate choice the municipality made to re-grade a street—even though the new grade resulted in an abrupt seven-foot drop in front of the plaintiff's house—clearly foreseeably resulted in the damage to plaintiff's property. *Less*, 28 Mont. at 31, 72 P. at 141.

¶29    Consistent with this conclusion, other courts have commonly rejected claims of inverse condemnation, including those with "taking or damaging" constitutional provisions, based upon single-event sewer backups. *See Dunn*, 328 P.3d at 1274; *Henderson*, 827 N.W.2d at 492; *AGCS Marine Ins. Co. v. Arlington Cty.*, 800 S.E.2d 159, 168 (Va. 2017); *City of Dallas. v. Jennings*, 142 S.W.3d 310, 315 (Tex. 2004); *Edwards v. Hallsdale-Powell Util. Dist. Knox County*, 115 S.W.3d 461, 467 (Tenn. 2003). Similar

22

decisions have been rendered in cases of flooding. *See Hampton v. Metro. Water Reclamation Dist.*, 57 N.E.3d 1229, 1239 (Ill. 2016); *Farmers New World Life Ins. Co. v. Bountiful City*, 803 P.2d 1241, 1244, 1246 (Utah 1990). Cases in which property owners have succeeded in sewage or flooding takings claims have involved repeated or chronic invasions that permitted a jury to consider and find that the government, by failing to correct the source of the repeated overflows, acted intentionally or foreseeably. *See Ark. Game & Fish Comm'n*, 568 U.S. at 39, 133 S. Ct. at 522-23 ("[W]hile a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove [a taking]. Every successive trespass adds to the force of the evidence.") (internal citation and quotation omitted); *see generally Dishman v. Nebraska Public Power Dist.*, 482 N.W.2d 580 (Neb. 1992); *Dekalb County v. Orwig*, 402 S.E.2d 513 (Ga. 1991); *Robinson v. Ashdown*, 783 S.W.2d 53 (Ark. 1990).

¶30　Our decision here does not preclude the possibility of establishing that the grease clog proximately caused the damage to the Wittmans' home or that the City's sewer cleaning program was deficient in a way that the City could be held liable through negligence, nuisance, or some other basis. *See generally Knight-Missoula*, 252 Mont. 232, 827 P.2d 1270; *Wheeler v. Bozeman*, 232 Mont. 433, 757 P.2d 345 (1988). These alternatives were not pled here and therefore we do not reach them. Further, the difficulties incumbent in prosecuting inverse condemnation actions have moved several states to initiate, by statute, programs to compensate landowners who are damaged by actions of the

government, an idea that must necessarily be left to the Legislature. *See* Robert Meltz, *Takings Law Today: A Primer for the Perplexed*, 34 Ecology L.Q. 307, 311 (2007).

¶31 We conclude the District Court properly entered summary judgment in favor of the City, and affirm.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON

Justice Dirk Sandefur, dissenting.

¶32 I dissent. Prior to Montana statehood, as it does today, the Fifth Amendment to the United States Constitution expressly proscribed that private property shall not "be *taken* for public use[] without just compensation." U.S. Const. amend V (emphasis added).[1] In contrast, our 1889 Constitution provided that "[p]rivate property shall not be *taken or damaged* for public use without just compensation . . . first made." Mont. Const. art. III, § 14 (1889) (emphasis added). With some additional language not pertinent here, our 1972 Constitution carried forward that identical provision. Mont. Const. art. II, § 29 ("[p]rivate

---

[1] The Fifth Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S. Ct. 2448, 2457 (2001) (citing *Chicago, Burlington & Quincy R.R. v. City of Chicago*, 166 U.S. 226, 235-41, 17 S. Ct. 581, 584-86 (1897) (decided as a matter of Fourteenth Amendment substantive due process without express reference the Fifth Amendment Takings Clause)).

property shall not be *taken or damaged* for public use without just compensation . . . first made" – emphasis added). The Article II, Section 29 *or damaged* protection is thus distinct from and significantly broader than its *takings* protection and the similar Fifth Amendment *takings* protection upon which the Montana *takings* protection was and remains modeled. In 1903, we admonished that the broader fundamental Montana constitutional right to just compensation for private property *damaged* for or by public use must be strictly enforced and not "*frittered away by construction*." *Less v. City of Butte*, 28 Mont. 27, 34, 72 P. 140, 142 (1903) (emphasis added). In 1977, we similarly noted that "the tendency under our system" of government "is too often to sacrifice the individual to the community" and that it is unreasonable to *not* require the government to "pay for property which it destroys *or impairs*." *Rauser v. Toston Irrigation Dist.*, 172 Mont. 530, 539, 565 P.2d 632, 638 (1977) (internal punctuation and citation omitted – emphasis added).

¶33 However, in disregard of our own prior admonitions in *Less* and *Rauser*, the Court today indiscriminately fritters away and eviscerates the fundamental *or damaged* protection of private property provided by Article II, Section 29. It does so based on our historical, and now continuing, failure since *Rauser* to clearly and consistently articulate the essential elements of *consequential damaging* claims, distinct from *categorical taking* claims (whether based on actual physical appropriation of private property for public use or by consequential physical damage to or interference with its use and enjoyment so substantial to be tantamount to a physical appropriation) and *regulatory taking* claims. From *Rauser* on, we have failed to clearly and consistently define and apply the causation

25

element common to Montana consequential *taking* and *damaging* claims derived from common law tort causation. Despite our repeated recognition that the proximate cause element of such claims is identical to the proximate cause element in common law tort claims, the Court continues to fail to recognize that proof of proximate causation has always included distinct component requirements for proof of causation-in-fact and, where at issue, reasonable foreseeability of harm, and that, in 1996, we discarded and replaced the archaic, often-conflated, and nebulous concept of "proximate cause" with a more refined formulation that carries forward those essential component requirements in more definite and simplified forms.[2] The Court's analysis similarly fails to recognize and correctly apply the related but distinct requirement in consequential *taking* and *damaging* claims, first recognized in 1897, for proof that the consequential damage to private property be of a type or extent uncommon to the deleterious effect to which the subject public use or improvement commonly subjects or affects the public or community at large. Compounding our ongoing lack of analytical clarity and attention to detail, our post-*Rauser* inverse condemnation cases have, without analysis or basis in Montana law, further

---

[2] I thus concur with the Court's Opinion, ¶¶ 9-12, that the California formulation of the causation element of a consequential damaging inverse condemnation claim in *City of Oroville v. Superior Ct.*, 446 P.3d 304, 310-11 (Cal. 2019), is of no interpretive guidance under Article II, Section 29 to the extent that it is California's latest attempt to settle the nagging confusion and "paradox" resulting from its prior inconsistent formulation of the essential elements of a *consequential damaging* claim, particularly its continuing struggle with reconciliation and application of reasonable foreseeability of harm as an included consideration in the common law concept of "proximate cause." See Opinion, ¶¶ 11-12 (noting "paradox[ical]" California consequential damaging inverse condemnation formulation irreconcilably equating absence of foreseeable harm with satisfaction of "proximate cause").

anomalously inserted and perpetuated the manifestly superfluous "as deliberately planned and built" language, cursorily derived from California's paradoxical public-policy-based consequential damaging formulation,[3] into the stated essential elements of Montana consequential *damaging* inverse condemnation claims. These and various other related analytical errors today result in a scattershot analysis under which the Court strains to deny the Wittmans just compensation for clearly foreseeable consequential private property damage caused by a public improvement without any contributing fault attributable to them.

1. Application of Article II, Section 29 to Eminent Domain by Condemnation and Inverse Condemnation.

¶34 Like the Fifth Amendment takings protection, the Montana constitutional protection against the uncompensated *taking* or *damaging* of private property comes to bear in two distinct but related ways. It first imposes a constitutional limitation on the exercise of the inherent government power of eminent domain to affirmatively acquire private property for public use through the prescribed statutory process for formal condemnation, valuation, and advance compensation.[4] *See Buhmann v. State*, 2008 MT 465, ¶ 69, 348 Mont. 205,

---

[3] Despite correct rejection of the *Oroville* causation formulation, however, the Court still fails to recognize and correct our own anomalous conflation, without analysis, of the reasonable foreseeability of harm requirement with the "as deliberately planned and built" language lifted out-of-context from California's paradoxical public-policy-based consequential damaging causation formulation. *See Knight v. City of Missoula* (*Knight-Missoula)*, 252 Mont. 232, 243, 827 P.2d 1270, 1276 (1992) (citing *Rauser*); *Rauser*, 172 Mont. at 539, 565 P.2d at 638 (citing *Albers v. Los Angeles Cty.*, 398 P.2d 129, 136 (Cal. 1965)); Opinion, ¶¶ 11-12 (noting "paradox[ical]" California consequential damaging inverse condemnation formulation irreconcilably equating absence of foreseeable harm with satisfaction of "proximate cause").

[4] *See* Title 70, chapter 30, parts 1-3, MCA.

201 P.3d 70 (Article II, Section 29 "obviously contemplates" a formal pre-taking "condemnation" proceeding); *Eby v. City of Lewistown*, 55 Mont. 113, 122-23, 173 P. 1163, 1165 (1918) (constitutional requirement for prior compensation by judicial proceeding is express condition precedent to taking or damaging property for public use).[5]

Second, like the Fifth Amendment takings protection, Article II, Section 29 is also a self-executing fundamental right that implicitly provides an independent constitutional "inverse condemnation" remedy for "just compensation" for private property *taken* or *damaged* for or by "public use" *without* utilization of the formal statutory condemnation process. *Wohl v. City of Missoula*, 2013 MT 46, ¶ 55, 369 Mont. 108, 300 P.3d 1119 (inverse condemnation is "inverse" because the action involves a claim asserted by the private property owner rather than a statutory action initiated against the property owner by the public condemnor); *Adams v. Dep't of Highways*, 230 Mont. 393, 397, 753 P.2d 846, 848 (1988).[6]

---

[5] In the case of the state, and its various political subdivisions and other entities authorized by statute to condemn private property for a beneficial public use, eminent domain is the authority, inherent in state sovereignty and similarly derivative police power to legislate in furtherance of the general public health, safety, and welfare, to affirmatively appropriate private property for public use as provided by statute, subject to judicial determination of public need. *Lake v. Lake Cty.*, 233 Mont. 126, 130, 759 P.2d 161, 163 (1988); *State v. Aitchison*, 96 Mont. 335, 341, 30 P.2d 805, 807-08 (1934); *Butte, Anaconda & Pacific Ry. v. Mont. Union Ry. Co.*, 16 Mont. 504, 536, 41 P. 232, 243 (1895).

[6] *Accord Goebel v. City of Santa Barbara*, 111 Cal. Rptr. 2d 901, 908 (Cal. Ct. App. 2001); *Customer Co. v. City of Sacramento*, 895 P.2d 900, 905 (Cal. 1995) ("inverse condemnation" involves improper taking or damaging of private property without formal condemnation, thereby effectively circumventing the constitutional requirement for just compensation paid in advance); *Breidert v. S. Pac. Co.*, 394 P.2d 719, 721 n.1 (Cal. 1964) (constitutional "principles which affect the parties' rights" regarding an alleged inverse condemnation "are the same as those in an eminent domain action" – internal citations omitted); *United States v. Clarke*, 445 U.S. 253, 256-57, 100

## 2. Limited and Coextensive Scope of Federal and State *Takings* Protection.

¶35 Based on their identical language, the *takings* protection afforded by Article II, Section 29 is "coextensive with" that provided by the Fifth Amendment. *Buhmann*, ¶¶ 63-64. We thus generally interpret and apply the Article II, Section 29 *takings* protection in accordance with Fifth Amendment jurisprudence. *Buhmann*, ¶¶ 63-64. While the doctrinal distinction remains somewhat blurred,[7] the Fifth Amendment and Article II,

S. Ct. 1127, 1129 (distinguishing inverse condemnation from affirmative condemnation per statute).

[7] The doctrinal attributes of Fifth Amendment and Montana constitutional *takings* claims are often confusing, muddled, and or incomplete. *See Kafka*, ¶¶ 148-56 (Nelson, J., dissenting – noting continued conflation of constitutional takings and substantive due process principles); *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539, 125 S. Ct. 2074, 2082 (2005) (acknowledging that Fifth Amendment regulatory takings jurisprudence "cannot be characterized as unified"); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 866, 107 S. Ct. 3141, 3164 (1987) (Stevens, J., dissenting – noting "the necessarily vague standards" in Fifth Amendment takings law and that "[e]ven the wisest lawyers would have to acknowledge great uncertainty about the scope" of federal takings jurisprudence); John L. Horwich & H. L. Lund, *Montana Supreme Court Unnecessarily Misconstrues Takings Law*, 55 Mont. L. Rev. 455, 466 (1994) (noting that this Court "is not alone in struggling with takings jurisprudence" and that it "remains complex and confusing"); Bradley C. Karkkainen, *The Police Power Revisited: Phantom Incorporation and the Roots of the Takings "Muddle,"* 90 Minn. L. Rev. 826, 827-38 and 847-50 (2006) (describing Fifth Amendment regulatory taking jurisprudence as a "doctrinal muddle" lacking "theoretical coherence"); Kris W. Kobach, *The Origins of Regulatory Takings: Setting the Record Straight*, 1996 Utah L. Rev. 1211, 1212-34 (1996) (noting doctrinal history and peculiarities of compensable categorical and regulatory takings analysis including consequential damaging of property rising to the level of a categorical taking); John D. Echeverria & Sharon Dennis, *The Takings Issue and the Due Process Clause: A Way Out of a Doctrinal Confusion*, 17 Vt. L. Rev. 695, 695-720 (1993) (describing constitutional takings jurisprudence as "a confused body of law containing contradictory principles and standards" and noting still pervasive historical conflation of the Fifth Amendment Takings Clause and the Fifth and Fourteenth Amendments due process clauses); Carol M. Rose, *Mahon Reconstructed: Why the Takings Issue Is Still A Muddle*, 57 S. Cal. L. Rev. 561 (1984); Douglas W. Kmiec, *The Original Understanding of the Taking Clause Is Neither Weak Nor Obtuse*, 88 Colum. L. Rev. 1630 (1988); Joseph L. Sax, *Takings and the Police Power*, 74 Yale L.J. 36, 37 (1964) (characterizing Fifth Amendment regulatory takings analysis as "a welter of confusing and apparently incompatible results" and a doctrinally "crazy-quilt pattern" of jurisprudence).

Section 29 generally apply to two types of *takings*—categorical takings and regulatory takings. A *categorical taking* (i.e., a physical *taking*) generally occurs when a government entity, or other statutorily authorized condemnor: (1) takes or asserts direct physical possession or dominion over a cognizable aspect of private property; (2) otherwise *physically* ousts or denies the owner of possession, use, or enjoyment of private property; or (3) engages in or authorizes a local public land use activity that causes some form of consequential *physical* invasion or intrusion of or upon private property that damages the property, or interferes with the owner's property rights, to such an extent to be tantamount to an actual physical "appropriation" of the property or "ouster" of the owner from the property. *See Kafka v. Mont. Dep't of Fish, Wildlife & Parks*, 2008 MT 460, ¶ 68, 348 Mont. 80, 201 P.3d 8; *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321-25, 122 S. Ct. 1465, 1478-80 (2002) (internal citations omitted); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014, 112 S. Ct. 2886, 2892-93 (1992) (internal citations omitted); *Sanguinetti v. United States*, 264 U.S. 146, 149, 44 S. Ct. 264, 265 (1924). *See also Cottonwood Envtl. Law Ctr. v. Knudsen*, 2022 MT 49, ¶ 19, 408 Mont. 57, 505 P.3d 837; *Less*, 28 Mont. at 32, 72 P. at 141. In contrast, a *regulatory taking* occurs when government regulations either "completely deprive an owner of all economically beneficial use" of the property or, based on *ad hoc* consideration of a complex of "factors" as applied to the particular circumstances of each case, otherwise impedes exercise of the owner's property rights to such an extent to be tantamount to a physical taking of all or part of the property. *Kafka*, ¶¶ 67-78, (internal citations omitted); *Murr v. Wisconsin*, __

30

U.S. __, __, 137 S. Ct. 1933, 1942-48 (2017) (internal punctuation and citations omitted); *Tahoe-Sierra*, 535 U.S. at 321-25, 122 S. Ct. at 1478-80 (distinguishing categorical and regulatory takings).[8]

3. Broader Article II, Section 29 Protection Against Uncompensated *Damaging* of Private Property for Public Use.

¶36 At common law, absent some form of consequential physical invasion caused by a nearby public improvement that was of such magnitude to be tantamount to a *categorical taking* of all or a portion of the property, the only private remedies available for lesser consequential property damage or interference caused by public improvements or uses were common law remedies such as negligence, nuisance, or trespass, as applicable. *See Less*, 28 Mont. at 31, 72 P. at 141; *Reardon v. San Francisco*, 6 P. 317, 322-24 (Cal. 1885); *Radcliff's Ex'rs v. City of Brooklyn*, 4 N.Y. 195, 206 (N.Y. 1850); *Callender v. Marsh*, 18 Mass. 418, 430 (Mass. 1823); Restatement (Second) of Torts § 158 (Am. Law Inst. 1965) (in re trespass upon land). To augment the limited common law and constitutional *takings* remedies, many state constitutions, like our 1889 and 1972 constitutions, included taken *or damaged* language to more broadly provide a constitutional remedy for the direct or indirect non-taking *consequential damaging* of private property caused by the construction or operation of public improvements or works. *See Less*, 28 Mont. at 31-32, 72 P. at 141 (1889 Montana Constitution Article III, Section 14 "or damaged" provision displaced

---

[8] *See also Cottonwood*, ¶ 19; *Richards v. Cty. of Missoula*, 2012 MT 236, ¶¶ 5-11 and 34-35, 366 Mont. 416, 288 P.3d 175; *Seven Up Pete Venture v. State*, 2005 MT 146, ¶¶ 14 and 20-37, 327 Mont. 306, 114 P.3d 1009; *Kudloff v. City of Billings*, 260 Mont. 371, 375-77, 860 P.2d 140, 142-44 (1993).

"harsh" common law "*damnum absque injuria*" rule precluding non-tort-based property damage claims against municipalities for consequential damage caused by subsequent improvement of public streets); *Reardon*, 6 P. at 320-26 (construing identical "or damaged" provision of 1879 California Constitution).[9]  As aptly recognized by the California Supreme Court in 1885, the "or damaged" provision of the California Constitution:

> refers to something *more than a direct or immediate damage* to private property, such as its invasion or spoliation . . . [and] should be *construed in* . . . its *ordinary and popular sense*.  It embraces *more than* the *taking*. . . . [As recognized regarding] a like provision in the [Georgia] Constitution, . . . [*a*]*ny damage* to property for public use must receive its compensation.  It . . . will no doubt often occur, that the *consequential damage may impose a more serious loss* upon the owner than a temporary spoliation or invasion of the property.

> [Such state constitutional provisions more broadly apply to] damages . . . [that are] consequential . . . [*whether*] the exercise of public use . . . [was] *done with care and skill or not*.

---

[9] The constitutions of at least twenty-one other States similarly provide broader protections against the taking *or damaging* of private property for public use without just compensation.  *See, e.g.*, Alaska Const. art. I, § 18; Ariz. Const. art. II, § 17; Ark. Const. art. II, § 22; Colo. Const. art. II, § 15; Ga. Const. art. I., § 3, par. I(a); Haw. Const. art. I, § 20; Ill. Const. art. I, § 15; La. Const. art. I, § 4(B)(1); Minn. Const. art. I, § 13; Miss. Const. art. III, § 17; Mo. Const. art. I, § 26; Neb. Const. art. I, § 21; N.M. Const. art. II, § 20; Okla. Const. art. II, § 24; S.D. Const. art. VI, § 13; Tex. Const. art. I, § 17; Utah Const. art. 1, § 22; Va. Const. art. I, § 11; Wash. Const. art. I, § 16; W. Va. Const. art. III, § 9; Wyo. Const. art I, § 33.  *See also Kafka*, ¶ 30 n.5 (noting that the broader language of Article II, Section 29 "is not unique among state constitutions" and that "[r]oughly half" of the other state constitutions include similarly broad language – citing Julius L. Sackman, 2A *Nichols on Eminent Domain* § 6.01[12][c], 6-29 (3d ed., Matthew Bender 2008)).  We have thus recognized that other States' interpretations of similar constitutional "or damaged" provisions may be pertinent guiding authority in construing the "or damaged" protection provided by Article II, Section 29.  *See Buhmann*, ¶ 68 (citing *Customer Co.*, 895 P.2d at 904-16 (holding that similar California "or damaged" protection narrowly applies to consequential damages incident to government exercise of eminent domain power by formal condemnation and those incident to construction or operation of public improvements to land and is thus not applicable to claims for damages caused by government officers in the enforcement of the criminal law)); *Rauser*, 172 Mont. at 538-39, 565 P.2d at 638 (citing California authority); *Less*, 28 Mont. at 32; 72 P. at 141 (citing California and Georgia authority).

[T]he right . . . is not restricted to . . . where [the claimant] is entitled to recover [in] tort at common law. . . . [It applies to private property] *consequently damaged* by the work done, *whethe*r it is done *carefully and with skill or not*. . . . [It] was intended to assure compensation . . . where the damage is directly inflicted . . . [*or* involves] *consequential* [damage] . . . for which . . . [there was no] common law [remedy].

[T]he word "*damaged*" . . . [was] intended to give a remedy, as well [as] where one existed before . . . [and] *to superadd to* the [*takings* protection] . . . a guaranty against damage where none previously existed.

.   .   .

[Where] the damage is to the houses affixed to the land[,] [t]his is *special damage* to the plaintiffs, for which they are entitled to recover, though the[] [*damage*] may be . . . *consequential*.

*Reardon*, 6 P. at 322-26 (emphasis added – internal punctuation and citations omitted).

The broader constitutional "or damaged" protection was:

added to clarify that the government was obligated to pay just compensation for property *damaged in connection with* the construction of *public improvements, even if* [it] *had not physically invaded* the damaged property.

.   .   .

[T]he addition of the . . . "or damaged" . . . [protection] is not limited to physical invasions of property taken for "public use" in eminent domain, but also encompasses *special and direct damage to adjacent property* resulting from the construction of public improvements.

*Customer Co. v. City of Sacramento*, 895 P.2d 900, 906-07 (Cal. 1995) (emphasis added).

Accordingly, in contrast to the narrower *takings* protection, the Article II, Section 29 *or damaged* provision more broadly requires just compensation for any *direct or consequential* property damage or interference caused to private property by a public improvement or land use, regardless of whether the owner was not deprived of all

33

beneficial use of the property or that the damage was repairable or temporary in nature. *Less*, 28 Mont. at 31-32, 72 P. at 141 (citing *City of Atlanta v. Green*, 67 Ga. 386, 388-89 (Ga. 1881), *inter alia*); *Root v. Butte, Anaconda, & Pac. Ry. Co.*, 20 Mont. 354, 358, 51 P. 155, 156 (1897); *Customer Co.*, 895 P.2d at 906-07 (citing *Reardon*, 6 P. at 322-26, and 2 & 2A Nichols on Eminent Domain §§ 6.22-6.26, pp. 6-157 to 6-190 (reviewing origin of "or damaged" clauses in various state constitutional provisions)); *Reardon*, 6 P. at 322-26 (citing *Green*); *Green*, 67 Ga. at 388-89 (state constitutional protection for private property "taken or *damaged* for public use" broadly requires compensation for "any direct and immediate damage done to private property, such as its invasion or spoliation," as well as any other "consequential" damage caused by a public use or improvement – emphasis original – quoted in *Less*).  Article II, Section 29 thus generally encompasses three distinct

species of inverse condemnation claims—*categorical takings* claims,[10] *regulatory takings* claims,[11] and *consequential damaging* claims.[12]

---

[10] *See, e.g.*, *Cottonwood*, ¶ 19; *Kafka*, ¶ 68 (distinguishing between categorical takings and regulatory takings); *Knight-Missoula*, 252 Mont. at 240, 827 P.2d at 1275 (analyzing claim as a *consequential takings* claim to extent based on the claimed public road interference with private property due to traffic, dust, and exhaust); *Rauser*, 172 Mont. at 533-34, 536-37, and 543, 565 P.2d at 635-37 and 640 (expressly characterizing the consequential deleterious effect of the public improvement as a "taking" and the property as having been "taken"); *Sanguinetti*, 264 U.S. at 149, 44 S. Ct. at 265 (distinguishing claim based on permanent consequential physical invasion of private property tantamount to a government appropriation from mere "consequential injury"). *See also Tahoe-Sierra*, 535 U.S. at 321-25, 122 S. Ct. at 1478-80 (distinguishing categorical takings from regulatory takings); *Lucas*, 505 U.S. at 1014, 112 S. Ct. at 2892-93 (distinguishing physical takings from regulatory takings); Kris W. Kobach, *The Origins of Regulatory Takings: Setting the Record Straight*, 1996 Utah L. Rev. 1211, 1212-34 (1996) (noting doctrinal history and peculiarities of compensable categorical and regulatory takings analysis including consequential damaging of property rising to the level of a categorical taking).

[11] *See, e.g.*, *Cottonwood*, ¶ 19; *Helena Sand & Gravel, Inc. v. Lewis & Clark Cty. Planning & Zoning Comm'n*, 2012 MT 272, ¶¶ 43-48, 367 Mont. 130, 290 P.3d 691 (remanding for regulatory takings analysis); *Richards*, ¶¶ 5-11 and 34-35 (alleged regulatory taking based on county denial of subdivision approval); *Kafka*, ¶¶ 67-79 (applying Fifth Amendment regulatory takings analysis); *Seven Up Pete*, ¶¶ 14 and 20-37 (alleged regulatory taking based on state law prohibition of cyanide heap leaching method of open-pit gold and silver mining); *Kudloff*, 260 Mont. at 375-77, 860 P.2d at 142-44 (alleged regulatory taking based on involuntary city annexation of private property); *Knight-Missoula*, 252 Mont. at 240, 827 P.2d at 1275 (analyzing asserted claim as regulatory takings to extent based on city refusal to close public road); *Knight v. City of Billings* (*Knight-Billings*), 197 Mont. 165, 168-74, 642 P.2d 141, 142-46 (1982) (regulatory taking claim based on city refusal to rezone restrictive residential area along urban street/commercial area for higher intensity zone – holding that no physical taking occurred but city refusal to rezone "impose[d] a servitude" limiting "the use and marketability" of the subject private properties sufficient to constitute a taking); *Murr*, __ U.S. at __, 137 S. Ct. at 1942-48; *Tahoe-Sierra*, 535 U.S. at 321-25, 122 S. Ct. at 1478-80; *Lucas*, 505 U.S. at 1014, 112 S. Ct. at 2892-93.

[12] *See, e.g.*, *Deschner v. Mont. Dep't of Highways*, 2017 MT 37, ¶¶ 3-7, 12-14, and 21-22, 386 Mont. 342, 390 P.3d 152 (alternative non-taking consequential damaging claim based on falling rock damage to home allegedly caused by nearby highway improvement/drainage work); *Adams*, 230 Mont. at 394-95, 398, and 404, 753 P.2d at 846-48 and 852-53 (asserted non-taking consequential damaging claim based on interference with use and enjoyment of home caused by expansion of nearby rural street to urban arterial – internal citations omitted); *Root*, 20 Mont. at 356-60, 51 P. at 155-57 (non-taking consequential damaging claim based on interference with use and enjoyment of home caused by operation of railroad in adjoining street); *Less*, 28 Mont. at 31-34, 72 P. at 141-42 (non-taking consequential damaging claim based on interference with use of home caused by a significant street and sidewalk grade change in front of home).

4. Essential Elements of Non-Taking Consequential Damaging Inverse Condemnation Claims.

¶37 The first question regarding an Article II, Section 29 inverse condemnation claim is a threshold question of law for court determination as to whether the claimed *taking* or *damaging* involves a legally cognizable property interest—a "compensable property interest"—independently established or recognized under some other source of state or federal law. *Kafka*, ¶¶ 32-33 (internal citations omitted); *Members of the Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005). *Accord Malpeli v. State*, 2012 MT 181, ¶¶ 14-15, 366 Mont. 69, 285 P.3d 509 (internal citations omitted). *See also Billings Yellow Cab, LLC v. Mont. Pub. Serv. Comm'n*, 2014 MT 275, ¶ 15, 376 Mont. 463, 335 P.3d 1223; *Pub. Lands Access Ass'n v. Madison Cty. Comm'rs*, 2014 MT 10, ¶¶ 61-73, 373 Mont. 277, 321 P.3d 38.[13] The pertinent focus is whether the asserted property interest has the characteristics of property such as, *inter alia*, rights of possession, use, exclusion of others, control, transfer, and disposition. *Malpeli*, ¶¶ 15 and 24 (internal citations omitted). If so, the claim must then proceed to determination and application of the pertinent facts to the remaining essential elements of the claim. *See Buhmann*, ¶¶ 58-59 (distinguishing respective provinces of court and fact-finder); *Kafka*, ¶¶ 32 and 69; *Knight v. City of Missoula* (*Knight-Missoula*), 252 Mont. 232, 240-42, 827 P.2d 1270, 1275-76 (1992). While we have yet to carefully and consistently identify and define them in a

_____

[13] If this threshold question turns on a genuine issue of material fact, the predicate fact question must be determined by the applicable finder of fact. *See Buhmann*, ¶¶ 56-59.

uniform manner, a summary step-through of our pertinent precedent clearly manifests the essential elements of an Article II, Section 29 *damaging* claim in contrast to the Court's strained formulation here and the distinct elements of categorical consequential *taking* claims.

A. Early Montana Non-Taking Consequential Damaging Cases: *Root* and *Less*.

¶38 Interestingly, the term "inverse condemnation" apparently did not appear in our jurisprudential vernacular until the 1960s. *See Robertson v. State Highway Comm'n*, 148 Mont. 275, 282, 420 P.2d 21, 24 (1966); *State ex rel. State Highway Comm'n v. Mont. Fourth Jud. Dist. Ct.*, 142 Mont. 198, 200, 383 P.2d 481, 482 (1963); *Bakken v. State*, 142 Mont. 166, 167, 382 P.2d 550, 551 (1963). We nonetheless first recognized the essence of the claim as early as 1897. In *Root*, we considered a Butte homeowner's non-taking consequential *damaging* claim against a railroad under the "or damaged" provision of Article III, Section 14 of our 1889 Constitution. *See Root*, 20 Mont. at 356-58, 51 P. at 155-56. The homeowner alleged that the "the construction and operation" of a railroad in the platted city street in front of his home, and attendant deleterious effects (i.e., "blowing of whistles, ringing of bells, noises from engines and trains," chaff and smoke emissions, ground vibration, noise, and loss of prior access to adjoining or adjacent streets), substantially interfered with the use and enjoyment of his property, resulting in diminution of his property value. *Root*, 20 Mont. at 356-58, 51 P. at 155-56. In reference to the pre-Rules precursor to M. R. Civ. P. 9(g) (special damages pleading requirement), we noted that the homeowner pled only general damages (those that "naturally and necessarily result

37

from" the subject act or condition) and that the alleged deleterious effects of the railroad operation were thus *not* compensable as the "natural *and* necessary result of" a "well constructed and skillfully operated" railroad, "46 feet distant from" his home, "to any greater extent" than any similar "injur[y] [to] the general public." *Root*, 20 Mont. at 356-57, 51 P. at 155-56 (emphasis added). We held further, however, that, upon proper pleading of special damages (those "which are the *natural*[] *but not* the *necessary*[] *consequence*" of the subject conduct or circumstance), such damages as "*specially sustained* by reason of the [subject] public improvement" *and* "which are *not common to the public at large*" were constitutionally compensable under the Article III, Section 14 "or damaged" provision. *Root*, 20 Mont. at 357-60, 51 P. at 155-57 (emphasis added). We thus reversed the trial court dismissal of the claim with remand for a new trial. *Root*, 20 Mont. at 360, 51 P. at 157.

¶39     Six years later, in *Less*, we considered whether the district court erroneously denied the City of Butte's pre-Rules motion for "nonsuit" of a homeowner's claim for non-taking consequential property damage or interference caused by a significant street and sidewalk grade change in front of his home. *Less*, 28 Mont. at 31-33, 72 P. at 141 (preliminary statement of facts not paginated). We held that the district court properly rejected the City's assertion that the prior dedication and initial grading of the public street precluded the homeowner's claim because the constitutional "or damaged" provision "abrogated" the "harsh" common law "*damnum absque injuria*" rule precluding non-negligence-based homeowner claims against government entities for property damages caused by subsequent

38

improvement of previously dedicated townsite streets. *Less*, 28 Mont. at 31-34, 72 P. at 141-42. We thus affirmed, holding that the claimed "consequential" property damage or interference caused by the subject street and sidewalk improvements was constitutionally compensable under the Article III, Section 14 "or damaged" provision. *Less*, 28 Mont. at 31-34, 72 P. at 141-42 (emphasis added). *Root* and *Less* thus clearly recognized that the essential elements of proof of a consequential *damaging* inverse condemnation claim are: (1) substantial private property damage or interference; (2) caused as a *natural result*, regardless of whether a *necessary* result, of the building or operation of a public improvement or use of property; and (3) the subject property damage or interference is of a type or extent uncommon to the deleterious effect to which the improvement at issue commonly subjects the public or community at large. *See Less*, 28 Mont. at 31-34, 72 P. at 141-42; *Root*, 20 Mont. at 356-60, 51 P. at 155-57.[14]

  B. *Rauser* and Our Subsequent Over-Reading of *Rauser* in re "As Deliberately Planned and Built" and Foreseeability/Proximate Cause Elements of Inverse Condemnation Claims.

¶40    Jumping forward to 1977, *Rauser* involved an Article II, Section 29 consequential *takings* claim against the Toston Irrigation District[15] for compensation for permanently

---

[14] *See also, e.g., Wright v. City of Butte*, 64 Mont. 362, 210 P. 78 (1922) (compensation for non-taking consequential cost of new access steps, retaining wall, damaged lot trees and shrubbery, and service pipe relocation necessitated by adjacent street grade decrease); *Eby*, 55 Mont. at 125-29, 173 P. at 1166-67 (compensation for non-taking consequential cost of raising lot grade, building, and appurtenances to adjacent street grade increase).

[15] The 1955 Toston Irrigation Project in Broadwater County "consist[ed] of the Crow Creek pump unit and a water delivery system built as a part of the Missouri River Basin Project." *Rauser*, 172 Mont. at 533, 565 P.2d at 635. The irrigated land within the District "was to serve as a replacement for lands flooded by Canyon Ferry Reservoir" and, as of 1977, "cover[ed] nearly five thousand

recurring interference with adjoining private property, in the form of underground water migration, saturation, and surface flooding, caused by increased irrigation in the adjoining Irrigation District. *Rauser*, 172 Mont. at 533-37 and 543, 565 P.2d at 635-37 and 640 (expressly characterizing the consequential deleterious effect of the subject public improvement as a "taking" and the property as having been "taken"). Somewhat similar to the City's defense in this case, however, the Irrigation District asserted that the cause of the flooding was not the contemplated irrigation increase in the adjoining District, but rather, the adjacent property owners' "enlargement of [their] own irrigation ditch" which the District asserted "created a barrier to the natural drainage of the land." *Rauser*, 172 Mont. at 534, 565 P.2d at 635. As a preliminary matter, we recognized that a consequential "*taking*" can occur "without a total physical *appropriation*" of the property or any tortious conduct in the construction or operation of the subject public improvement. *Rauser*, 172 Mont. at 536-37, 565 P.2d at 636-37 (citing Fifth Amendment *takings* jurisprudence). We then cited *Less*, a consequential *damaging* case, for the similarly applicable proposition that the *taking* or *damaging* provision of Article II, Section 29 does not require proof that the government "physical[ly] inva[ded]" private property, only that the public improvement *caused* "*consequential* damage" to the property. *Rauser*, 172 Mont. at 537,

---

acres." *Rauser*, 172 Mont. at 533, 565 P.2d at 635. Pursuant to § 89-1301(3), RCM (1947), the statutory Irrigation District affirmatively condemned the subject district lands upon which the federal government then "built and own[ed] the physical assets of the irrigation system" for administration by the District. *Rauser*, 172 Mont. at 534-35, 565 P.2d at 635-36.

565 P.2d at 637 (emphasis added). Applying those essential elements of proof to the particular facts at issue, we held that:

> [T]he [off-site] damage done by the [irrigation] project was *foreseeable and foreseen*. It was *inevitable* that Rausers' land would be damaged by the construction of the project. . . . Where, as here, the damages are *known or knowable* and are an *inevitable* result of the intentional undertaking of the project, there is no need to show [any] negligen[ce]. . . . It is *enough to show* the *damages* were *proximately caused by* the undertaking of the project and a *reasonabl[y] foreseeable* consequence [thereof]. It is implicit in inverse condemnation that the extent of the *damage* be *of such* a *degree* as *to amount to* a *taking* of an interest in the property damaged.

*Rauser*, 172 Mont. at 538, 565 P.2d at 637 (generally citing *Albers v. Los Angeles Cty.*, 398 P.2d 129 (Cal. 1965) – emphasis added)).

¶41 Upon careful reading, *Rauser* held no more than that the factual "inevitab[ility]" and actually "foreseen" nature of the harm at issue, *as the factual proof in that case*, was more than sufficient to satisfy the minimum *causation element requirement* that the claimed "damages [be] *proximately caused by* the undertaking of the project and a *reasonabl[y] foreseeable consequence*" thereof. *Rauser*, 172 Mont. at 538, 565 P.2d at 637 (emphasis added). Unfortunately, our analysis was not the model of clarity in two significant regards. First, we redundantly referred to proximate cause and reasonable foreseeability as distinct causation requirements. Second, without clear analytical transition from the holding that we had just made (i.e., that the subject harm was a reasonably foreseeable consequence of increased irrigation in the Irrigation District), we noted that, in particular regard to "irrigation project[s]," "it appears inevitable . . . that certain unplanned for problems arise that damage adjacent property owners," in "many

41

instances" without "negligence or other wrongful conduct or omission," and often result in alternative tort and inverse condemnation claims. *Rauser*, 172 Mont. at 538, 565 P.2d at 637. We then generally referenced *Albers* as "[o]utstanding in the cases of [that] type" (i.e., cases including alternative tort and inverse condemnation claims), and then quoted and "adopted," as interpretive "guides" "applicable to" the particular circumstances at issue in *Rauser*, five *public policy considerations* enunciated by the California Supreme Court for balanced threshold *ad hoc* consideration in each case, regardless of proof of a sequential chain of causation-in-fact between the public improvement and subject harm at issue. *See Rauser*, 172 Mont. at 538-39, 565 P.2d at 637-38 (quoting from *Albers*, 398 P.2d at 136-37).[16] Strangely, however, we then stopped short and did not apply those *ad hoc* public policy considerations to the facts at issue in *Rauser*. *See Rauser*, 172 Mont. at 538-39, 565 P.2d at 637-38. But, as will be evident from the detailed analysis of the component requirements of proximate cause that follows below, our seemingly non-sequitur hanging

---

[16] Unlike the consequential *takings* claim at issue in *Rauser*, at issue in *Albers* was a non-taking consequential *damaging* claim. *Albers*, 398 P.2d at 131-38 (consequential land-shifting under nearby private properties caused-in-fact by construction of a public roadway in the vicinity of an unstable land formation). The California Court enunciated the so-called *Albers* factors as *interpretive public policy considerations* pertinent in assessing whether the proximate cause element of the claim required that the subject harm be reasonably foreseeable, aside from satisfaction of cause-in-fact, where the government neither intentionally nor negligently caused the subject harm. *Albers*, 398 P.2d at 136-37. Based on *ad hoc* application of those policy considerations to the circumstances at issue, the Court essentially held that proximate cause did *not* require that the type of property damage at issue be reasonably foreseeable under the particular circumstances of that case. *Albers*, 398 P.2d at 137. The California Court later recognized the paradoxical nature of that conclusion given that foreseeability of harm was an included consideration in the concept of common law proximate cause. *See Belair v. Riverside Cty. Flood Control Dist.*, 764 P.2d 1070, 1074-75 (Cal. 1988) (internal citation omitted)); *Holtz v. Superior Ct. of San Francisco*, 475 P.2d 441, 445 n.9 (Cal. 1970) (citing Van Alstyne, *Inverse Condemnation: Unintended Physical Damage,* 20 Hastings L.J. 431, 435-38 (1969)).

reference in *Rauser* to the threshold California *ad hoc* public policy considerations clearly pertained not to the essential elements of proof of an inverse condemnation claim, but to foreseeability of harm to the extent that it may implicate *ad hoc* public policy considerations as an included consideration of proximate cause in a particular case. *See Busta v. Columbus Hosp. Corp.*, 276 Mont. 342, 360-73, 916 P.2d 122, 133-40 (1996) (discussing "tortuous history" of the "law of foreseeability" of harm under Montana law and, *inter alia*, clarifying the role of foreseeability of harm in the causation context as a component consideration of proximate cause as applicable in a particular case). Consequently, despite our lack of analytical clarity, nothing in *Rauser* evinced any intent to "adopt" or apply any of the so-called *Albers* public policy considerations as essential elements *of proof* for inverse condemnation claims.

¶42     Nonetheless, though inconsequential in the narrow context of the particular facts at issue there, our lack of analytical clarity in *Rauser* would soon become the seed of what would later become one of the sources of the Court's flawed causation analysis here.  One of the five California *ad hoc* policy considerations quoted in *Rauser* was the question of whether "the property owners . . . suffer[ed] direct physical [property] damage . . . as the *proximate result* of the works *as deliberately planned and carried out*." *Rauser*, 172 Mont. at 539, 565 P.2d at 638 (quoting *Albers*, 398 P.2d at 136-37 – emphasis added).  Despite the manifest lack of any intent in *Rauser* to adopt and apply any of the California *ad hoc* public policy considerations as substantive elements *of proof* in Montana inverse condemnation claims, we later, by general citation to *Rauser* without analysis, cursorily

grafted onto the proximate cause element of such claims the additional language that the alleged physical property damage or interference be proximately caused by the public improvement *as deliberately planned and built*. *See Knight-Missoula*, 252 Mont. at 243, 827 P.2d at 1276 (citing *Rauser*); *Deschner v. Mont. Dep't of Highways*, 2017 MT 37, ¶¶ 17 and 22, 386 Mont. 342, 390 P.3d 152 (citing *Knight-Missoula* and *Rauser*); *Brishka v. Mont. Dep't of Transp.*, 2021 MT 129, ¶ 13, 404 Mont. 228, 487 P.3d 771 (citing *Deschner*); Opinion, ¶¶ 17-18 and 25 (internal citations omitted).

¶43    Regardless of our imprecise analysis, however, the narrow pertinent legal issue in *Rauser* was, in essence, whether the causation element of an inverse condemnation claim included a reasonable foreseeability of harm requirement in addition to proof of sequential causation-in-fact. *See Rauser*, 172 Mont. at 536-39, 565 P.2d at 636-38. Consistent with the common law proximate cause standard applicable in negligence claims since 1895 to this day, *see* § 27-1-317, MCA (enacted Mont. Civ. Code § 4330 (1895)), our manifestly implicit application of that causation standard in *Root* (holding that uncommon *special* damages, i.e., the natural *but not necessary consequence* "sustained by reason of the public improvement" are compensable under Montana constitutional "or damaged" provision), and our similar holding in *Less*, we answered in the affirmative by stating that the causation element in inverse condemnation claims requires proof of "proximate cause," and thus by implication, proof of its two component considerations—causation-in-fact and, as applicable in a particular case, reasonable foreseeability of harm. *See Rauser*, 172 Mont. at 538-39, 565 P.2d at 638-39; *compare Less*, 28 Mont. at 31-34, 72 P. at 141-42; *Root*, 20

Mont. at 356-60, 51 P. at 155-57. *Rauser* went no further, and thus did and does not support our later cursory, anomalous insertion of the superfluous "deliberately planned and built" language, lifted in isolation from a quoted California public policy consideration without any basis in Montana law, into the proximate cause element *of proof* for Montana inverse condemnation claims.

¶44 Further emphasizing the point, our repeated overreading of *Rauser* as the source of the anomalous "*as deliberately planned and built*" touted by the Court today as a limitation on the proximate cause element of a Montana consequential damaging inverse condemnation claim, Opinion, ¶¶ 17-18 and 25, irreconcilably conflicts with our consistently repeated recognition that "the analysis of proximate cause" in the inverse condemnation context is identical to, i.e., the same or coextensive with, the common law standard of proximate cause in tort claims. *Brishka*, ¶ 15; *Thelen v. City of Billings*, 238 Mont. 82, 85-86, 776 P.2d 520, 522-23 (1989) (citing *Rauser*). *Accord* Opinion, ¶ 12 (quoting *Brishka*, ¶ 15); *Deschner*, ¶¶ 17-19 (citing *Rauser* and distinguishing *Albers* as referenced in *Rauser*). We essentially recognized as much when we admonished five years ago that "the test for" Montana inverse condemnation claims "must be" interpreted in harmony with our prior Article II, Section 29 jurisprudence. *Deschner*, ¶¶ 12 and 17. We thus further noted that: (1) we did not adopt *any* of the *Albers* public policy considerations for use as anything other than interpretive "guides"; (2) we did not "actually apply" any of them in *Rauser*; and (3) the *Albers* policy guides "should not be strictly applied as elements" of proof to the extent "incommensurate with" our inverse condemnation

45

jurisprudence. *Deschner*, ¶¶ 16-17 and 21 (noting *Rauser* holding that inverse condemnation claims do not require "a showing of" tortious conduct, that *Rauser* is more "noteworthy for establishing what is *not* required" for inverse condemnation claims "than what is required," and that the *Albers*-based jury instruction regarding the essential elements of proof of a consequential *damaging* inverse condemnation claim was an incorrect statement of Montana law).[17]   I would therefore doctrinally limit *Knight-Missoula*, *Deschner*, and *Brishka* accordingly, and hereafter exclude the anomalous "deliberately planned and built" language from future statements of the essential elements of proof for consequential *takings* or *damaging* inverse condemnation claims.[18]

C. Pertinent Post-*Rauser* Montana Inverse Condemnation Cases.

¶45    At issue in *Knight v. City of Billings* (*Knight-Billings*), 197 Mont. 165, 642 P.2d 141 (1982), was an inverse condemnation claim asserted against the City of Billings by owners of homes in a residential neighborhood in the immediate vicinity of 24th Street West, a former county road annexed into the City in 1959. *Knight-Billings*, 197 Mont. at 166, 642 P.2d at 141-42.   The dispute arose after the City incrementally widened the original two-lane street into a five-lane arterial between 1972-78 to accommodate the burgeoning business sector in that area. *Knight-Billings*, 197 Mont. at 166-68, 642 P.2d at 141-42.

---

[17] Nor have we since applied *any* of the *Albers* factors as essential elements of proof in an inverse condemnation case before today.

[18] Such doctrinal clarification and limitation would not alter or undermine our ultimate holdings in any of those cases.

The roadway expansion substantially changed the conditions and environment in the residential neighborhood to the extent that:

> [t]here [was no longer] free access into driveways . . . [and are now] long waits in the fifth lane for passing traffic. Free access to and from the driveways is nearly impossible. There have been traffic accidents in front of the residential properties, and sometimes upon their properties. Children and pets are not safe in the front yards and pedestrian traffic along the sidewalks a few feet from passing vehicular traffic is dangerous. Average traffic flows at 22 miles per hour past their houses. Rocks and rubbish from passing traffic are thrown upon their lawns and into their houses. The sidewalks are constantly filthy, especially in winter. The noise from the passing traffic is so loud that front doors must be closed for conversation to be heard inside. Traffic noise is loud and aggravating at night. The houses cannot be ventilated from the east side because of dust and exhaust fumes. The houses and contents are constantly subject to vibrations. One of the residents testified that she had to tape her windows to avoid the bright light from the high intensity sodium vapor lighting that was installed. There appears to be general agreement that the houses are unsuitable for residential living.

*Knight-Billings*, 197 Mont. at 169, 642 P.2d at 143.

¶46    While we did not expressly characterize it as such, the claim at issue in *Knight-Billings* was a regulatory *taking* claim, rather than a non-taking consequential *damaging* claim, predicated on the City's refusal to re-zone the area from a low-intensity residential zone to a higher intensity zone that would allow the property owners to use or sell their properties for specified commercial use consistent with the growing businesses along 24th Street West. *See Knight-Billings*, 197 Mont. at 168-74, 642 P.2d at 142-46 (holding that no physical taking occurred but that the City's refusal to rezone the subject property "impose[d] a servitude, a limitation upon the use and marketability" of the subject private properties, that "interfered with the [homeowners'] private property interests . . . so as to constitute a '*taking*'" – emphasis added). Unlike in *Rauser* and here, the standard of

47

proximate causation for inverse condemnation claims was not at issue. *See Knight-Billings*, 197 Mont. at 168-74, 642 P.2d at 142-46. Consequently, nothing in *Knight-Billings* supports the Court's assertion today, Opinion ¶¶ 17-18 and 25, of the anomalous "*as deliberately planned and built*" language as an additional limitation on the proximate cause element of a Montana consequential *damaging* inverse condemnation claim.

¶47 *Adams* involved an inverse condemnation claim asserted against the state highway department by adjacent landowners based on the deleterious effects (i.e., increased traffic, noise, air pollution, and dust accumulation) caused by a bridge construction project in conjunction with the expansion of a formerly rural street to an urban arterial (Reserve Street) in Missoula. *Adams*, 230 Mont. at 394-95, 753 P.2d at 846-47. As in *Root* and *Less*, and in contrast to *Rauser* and *Knight-Billings*, the claim at issue in *Adams* was a consequential *damaging* claim rather than a categorical or regulatory *taking* claim. *See Adams*, 230 Mont. at 395, 398, and 404, 753 P.2d at 847-48 and 852-53 (citing *Knight-Billings*, *Less*, et al.). While not so clearly articulated, the focus on appeal was on the uncommon damage and actual pecuniary loss elements of the consequential *damaging* claim—the causation element of the claim was *not* at issue. *See Adams*, 230 Mont. at 398-405, 753 P.2d at 849-53 (noting that, unlike in *Knight-Billings*, the prevailing mixed residential/commercial zoning was "sufficient to maintain" the subject property values and thus did not effectively "singl[e] out [any] one group or individual," the road expansion "undoubtedly increased" the value of the properties for sale or "use[] in a commercial

fashion," and that the landowners had "not shown that their situation is any different from any other property owner who suffers the [e]ffects of living adjacent to a roadway with increased traffic"). As pertinent here, *Adams* thus manifested our continued recognition that the essential elements for consequential *damaging* claims distinctly require separate proof that the claimed property damage or interference harm caused by the subject improvement be uncommon to that experienced by other similarly situated properties and owners in the community at large. *Compare Root*, 20 Mont. at 358-59, 51 P. at 156-57.

¶48    In pertinent part, *Knight-Missoula* involved an inverse condemnation claim asserted against the City of Missoula and Missoula County by homeowners in a residential subdivision in the Pattee Canyon area after the City denied their 1989 petition to close a disputed roadway across a park that was platted in the original 1957 county subdivision. *Knight-Missoula*, 252 Mont. at 236-40, 827 P.2d at 1272-75. The subdivision developer apparently cut the roadway through the platted park for temporary access to facilitate initial subdivision development prior to city annexation in 1958. *Knight-Missoula*, 252 Mont. at 236-40, 827 P.2d at 1272-75. While the property owners indiscriminately pled their inverse condemnation claim as both a federal and Montana *taking* claim and a Montana consequential *damaging* claim, we analyzed the claim as a consequential and/or *regulatory taking* claim based on the claimed interference with private property rights (i.e., increased traffic, dust, and exhaust) caused by the City's refusal to close the road for public use. *Knight-Missoula*, 252 Mont. at 240, 827 P.2d at 1275 (noting that "a question of fact"

remained as to whether "a *taking*" occurred – emphasis added).[19] Upon reiteration of the *Rauser/Albers*-based statement that an inverse condemnation claim requires proof that "a public improvement *as deliberately planned and built*" "proximately caused" "actual physical damage" to private property, we held that a question of fact remained on the causation-in-fact component of the proximate cause and actual pecuniary loss elements of the claim. *Knight-Missoula*, 252 Mont. at 243, 827 P.2d at 1276-77 (citing *Rauser*, 172 Mont. at 539, 565 P.2d at 638 – emphasis added). *Knight-Missoula* is thus pertinent here only to the extent that it referenced the anomalous "as deliberately planned and built" language lifted from the *Albers* public policy considerations in *Rauser* and, with foreseeability of harm not at issue in that case, that we recognized causation-in-fact as an included component in the proximate cause element of the claim. *See Knight-Missoula*, 252 Mont. at 243, 827 P.2d at 1276-77 (citing *Rauser*, 172 Mont. at 539, 565 P.2d at 638).

¶49 At issue in *Deschner* were alternative negligence and inverse condemnation claims asserted by the owners of a home in the City of Billings against the state highway department for compensation for property damage caused when a two-million-pound rock

_____

[19] As an example of our frequent doctrinal imprecision, our *Knight-Missoula* analysis was ambiguous insofar that we characterized the claim as a *takings* claim but then analyzed it in conflated reference to *Adams* which was clearly a non-taking consequential *damaging* claim. *See Knight-Missoula*, 252 Mont. at 240-42, 827 P.2d at 1275-76 (citing *Adams*, 230 Mont. at 398-401, 753 P.2d at 849-51, for proposition that *Adams* "makes clear" that under "limited[] circumstances . . . problems associated with increased traffic may be compensable" as an inverse condemnation); *compare Adams*, 230 Mont. at 395, 398, and 404, 753 P.2d at 847-48 and 852-53 (citing *Knight-Billings* quoting *Less*, 28 Mont. at 32, 72 P. at 141 (in re broader Montana constitutional "or damaged" protection) and *People v. Symons*, 357 P.2d 451, 454-55 (Cal. 1960) (discussing damage to private property caused by deleterious effects of "public improvement" on "adjoining" property)).

slab separated from the Billings Rimrocks and fell onto their home. *Deschner*, ¶¶ 3-5. The homeowners alleged that the 1963 rerouting of a state highway closer to the Rimrocks, and the accompanying installation of a drainage culvert thereunder, caused increased water runoff onto the rockfall site, thereby destabilizing the rockface and causing the slab to separate and fall. *Deschner*, ¶¶ 4-5. The State contrarily asserted that the subject highway improvements were not substantial factors in causing the rockfall because the sole cause of the rockfall was natural geologic processes, and hat the subject culvert blockage actually decreased the amount of water runoff onto the site. *Deschner*, ¶ 6.

¶50    At trial, the District Court gave State-proposed jury instructions on the essential elements of proof of a consequential *damaging* inverse condemnation claim which, *inter alia*, incorporated the *ad hoc* California public policy considerations from *Albers*, 398 P.2d at 136-37, as quoted in *Rauser*. *See Deschner*, ¶¶ 7 and 13. After the jury returned a verdict in favor of the State on both claims, which included, *inter alia*, a specific finding that the State's conduct was not a substantial factor in bringing about the rockfall, the homeowners asserted on appeal that the District Court erroneously instructed the jury on the essential elements of the inverse condemnation claim by reference to the *Albers* public policy considerations, and thus erred in submitting questions of law for jury determination as questions of fact. *Deschner*, ¶¶ 8, 12-14, and 22. As a preliminary matter, we agreed and held that the State's proposed *Albers*-based jury instruction was an incorrect statement of the law. *Deschner*, ¶ 21. We affirmed the defense verdict, however, on the ground that both parties' proposed instructions included proximate causation as an essential element of

51

the inverse condemnation claim, and because the homeowners in any event failed to prove that the highway project was a substantial factor, i.e., a cause-in-fact, in bringing about the rockfall. *See Deschner*, ¶¶ 21-22.

¶51 Construed in harmony, our above-referenced cases manifest that, except for our overreading of *Rauser*, and beyond the threshold question of law as to whether a cognizable property interest is at issue, the essential elements of a Montana non-taking consequential *damaging* inverse condemnation claim are: (1) substantial physical damage or interference to or with private property; (2) proximately caused by the construction or operation of a nearby public improvement or property use; (3) the subject property damage or interference is of a type or extent uncommon to the deleterious effect to which the improvement at issue commonly subjects the public or community at large; and (4) actual pecuniary loss. *See* Mont. Const. art. II, § 29 ("[p]rivate property shall not be . . . *damaged* for public use without just compensation . . . to . . . the owner" – emphasis added); *Rauser*, 172 Mont. at 536-38, 565 P.2d at 636-38; *Less*, 28 Mont. at 31-32, 72 P. at 141; *Root*, 20 Mont. at 356-60, 51 P. at 155-57. As in the tort causation context, *see Brishka*, ¶ 15, *Deschner*, ¶ 19, and *Thelen*, 238 Mont. at 86, 776 P.2d at 523, the proximate cause element of a consequential *damaging* claim includes two component requirements: causation-in-fact and, as at issue in a particular case, reasonable foreseeability of harm. *See Rauser*, 172 Mont. at 536-38, 565 P.2d at 636-38. The anomalous limiting language "as deliberately planned and built" is thus *not* an included consideration in any essential element *of proof* for a consequential *taking* or *damaging* Montana inverse condemnation claim. In contrast

to the Court's formulation today, this formulation of the essential elements of a Montana consequential *damaging* inverse condemnation claim is solidly and exclusively based on Montana precedent, free of the corrupting influence of the anomalous "as deliberately planned and built" language derived from the non-essential California public-policy-based formulation unnecessarily quoted in *Rauser* and then perpetuated without analysis in *Knight-Missoula*, et al.

### D. Proximate Causation: Recognition of Simplified Montana Post-*Busta* Tort Causation Formulation in Inverse Condemnation Context.

¶52   *Rauser* correctly recognized that the proximate cause element of a consequential *taking* or *damaging* claim includes two component requirements: causation-in-fact and, as applicable, reasonable foreseeability of harm. *See Rauser*, 172 Mont. at 536-39, 565 P.2d at 636-38 ("[i]t is enough to show" that the claimed damage was "caused by" the public improvement at issue and was "a reasonabl[y] foreseeable consequence" thereof"). While we have long recognized that the standard of proximate cause applicable in inverse condemnation claims is the same as in tort claims, *supra*, we have strangely yet to reconcile that general statement with our clarification and simplification of the historically nebulous concept of common law proximate causation over 25 years ago. However variously stated (whether as a requirement of causation-in-fact, legal cause, proximate cause, or some combination thereof), the causation element of a common law tort claim historically included two component considerations: whether the subject conduct or circumstance was a cause-in-fact of the subject harm and, in regard to asserted independent intervening or superseding causes, whether the subject harm was of a type within the *scope or zone* of

53

reasonably foreseeable *risk* commonly attendant or associated with the subject conduct or circumstance. *See, e.g.*, *Young v. Flathead Cty.*, 232 Mont. 274, 281-83, 757 P.2d 772, 777 (1988); Restatement (Second) of Torts §§ 431 and 434 (Am. Law Inst. 1965); W.P. Keeton, *Prosser & Keeton On Torts* §§ 41-45, at 263-321 (5th ed. 1984). *See also Busta*, 276 Mont. at 360-70, 916 P.2d at 133-39 (discussing "tortuous history" of the "law of foreseeability" of harm "as it relates to liability law in Montana" – internal citations omitted). We have thus recognized that the harm at issue in a particular case was of a type reasonably foreseeable only if it occurred within the scope or zone of the risk of harm to other persons or property reasonably likely, under the circumstances at issue, to directly or indirectly result from the subject conduct or circumstance in a continuous sequence, unbroken by some other cause. *Gourneau ex rel. Gourneau v. Hamill*, 2013 MT 300, ¶ 12, 372 Mont. 182, 311 P.3d 760 (internal citations omitted); *Emanuel v. Great Falls Sch. Dist.*, 2009 MT 185, ¶¶ 13-14, 351 Mont. 56, 209 P.3d 244 (internal citations omitted); *Fisher v. Swift Transp. Co.*, 2008 MT 105, ¶¶ 21 and 23-26, 342 Mont. 335, 181 P.3d 601 (internal citations omitted); *Prindel v. Ravalli Cty.*, 2006 MT 62, ¶¶ 34 and 38-43, 331 Mont. 338, 133 P.3d 165 (internal citations omitted); *LaTray v. City of Havre*, 2000 MT 119, ¶¶ 24-26, 299 Mont. 449, 999 P.2d 1010 (internal citations omitted); *Lopez v. Great Falls Pre-Release Servs., Inc.*, 1999 MT 199, ¶¶ 26-31, 295 Mont. 416, 986 P.2d 1081 (internal citations omitted); *Lacock v. 4B's Restaurants*, 277 Mont. 17, 21-22, 919 P.2d 373, 375-76 (1996); *Busta*, 276 Mont. at 360-72, 916 P.2d at 133-40 (tracing "tortuous history" of "the law of foreseeability" back to *Palsgraf v. Long Island R.R. Co.*, 162 N.E.

99 (N.Y. 1928)); *Mang v. Eliasson*, 153 Mont. 431, 436-38, 458 P.2d 777, 780-82 (1969) (internal citations omitted); *Mize v. Rocky Mt. Bell Tel. Co.*, 38 Mont. 521, 532, 100 P. 971, 973 (1909) (construing § 6068 Rev. Codes (1907), now § 27-1-317, MCA[20]), *overruled on other grounds by Dawson v. Hill & Hill Truck Lines*, 206 Mont. 325, 671 P.2d 589 (1983); *Reino v. Mont. Mineral Land Dev. Co.*, 38 Mont. 291, 293-96, 99 P. 853, 854-55 (1909); *Palsgraf*, 162 N.E. at 100 ("risk reasonably to be perceived . . . imports [the] relation" of "*risk* to another or others *within the range of apprehension*" – emphasis added). However, the foreseeability of harm component of proximate cause has never required that the specific injury, or mechanism, manner, or sequence of injury, that actually occurred have been reasonably foreseeable. *See Emanuel*, ¶ 13; *Fisher*, ¶ 26; *Prindle*, ¶ 39; *Hinkle v. Shepherd Sch. Dist. No. 37*, 2004 MT 175, ¶ 30, 322 Mont. 80, 93 P.3d 1239 (internal citation omitted); *Samson v. State*, 2003 MT 133, ¶ 26, 316 Mont. 90, 69 P.3d 1154 (internal citation omitted); *Lacock*, 277 Mont. at 21-22, 919 P.2d at 375-76 (construing § 27-1-317, MCA); *Ekwortzel v. Parker*, 156 Mont. 477, 483, 482 P.2d 559, 562-63 (1971) (citing *Mang* and *Reino*); *Mang*, 153 Mont. at 437, 458 P.2d at 781 (internal citations omitted); *Mize*, 38 Mont. at 532, 100 P. at 973 (construing § 6068 Rev. Codes (1907), now § 27-1-317, MCA); *Reino*, 38 Mont. at 295-96, 99 P. at 854-55.[21]

---

[20] The general measure of tort damages "is the amount which will compensate for all the detriment proximately caused . . . whether it could have been anticipated or not." *See* § 27-1-317, MCA (enacted Mont. Civ. Code § 4330 (1895)).

[21] The concept of reasonable foreseeability of harm is the same whether as applicable to the duty element of a negligence claim, or as an included component of common law proximate cause. *Hinkle*, ¶ 30.

¶53 Nonetheless, over the years, our tort and inverse condemnation jurisprudence has inconsistently referred to *proximate cause* both as a causation requirement distinct from causation-in-fact, and as a singular term encompassing both causation-in-fact and foreseeability of harm. For example, many of our cases refer to causation-in-fact and proximate or legal cause as distinct elements of proof in such claims. *See, e.g.*, *Brishka*, ¶¶ 13 and 15 (noting "[p]roof of proximate cause is an essential element" of negligence, strict liability in tort, and Montana inverse condemnation claims and that "proximate cause" analysis is "identical" and "indistinguishable" in all three contexts – causation element of such claims requires that the subject conduct or circumstance was both "the actual and proximate cause" of the injury or harm at issue); *Smith v. Kerns*, 281 Mont. 114, 116-18, 931 P.2d 717, 718-19 (1997) (tort causation requires proof that the subject conduct or circumstance "was the actual and proximate cause" of the subject harm); *Busta*, 276 Mont. at 367, 916 P.2d at 137 (quoting 1 *Modern Tort Law* § 5.02 at 159-62); *Kitchen Krafters, Inc. v. Eastside Bank of Mont.*, 242 Mont. 155, 168, 789 P.2d 567, 575 (1990) ("[l]egal cause is synonymous with proximate cause" as distinct from causation-in-fact), *partially overruled by Busta*, 276 Mont. at 369-73, 916 P.2d at 138-40 (*inter alia*, limiting the role of foreseeability of harm as a causation consideration); *Thelen*, 238 Mont. at 85-86, 776 P.2d at 522-23 (noting that the analysis of "proximate cause" common to tort and inverse condemnation claims "has not been defined clearly in Montana law" – citing *Young*); *Young*, 232 Mont. at 281-83, 757 P.2d at 777 (tort causation requires proof of *causation-in-fact* and that subject injury was "the direct or indirect result[] *proximately*

56

*caused by*" the conduct at issue and that "the distinction between causation in fact and proximate cause, . . . occasionally referred to as *legal cause*, has not generally been made" in Montana jurisprudence – emphasis added); *Rauser*, 172 Mont. at 538, 565 P.2d at 637 ("[i]t is enough" in an inverse condemnation claim "to show the damages were *proximately caused* by the undertaking . . . *and* a *reasonable foreseeable* consequence" thereof – emphasis added). In contrast, we have also inconsistently but more correctly referred to proximate cause as encompassing distinct component requirements for proof of causation-in-fact and reasonable foreseeability of harm not interrupted by some other unforeseeable intervening cause-in-fact. *See, e.g.*, *Deschner*, ¶¶ 21-22; *Labair v. Carey*, 2012 MT 312, ¶¶ 20-24, 367 Mont. 453, 291 P.3d 1160 (clarifying and reconciling causation element of a legal malpractice claim as a combined function of causation-in-fact and reasonable foreseeability of harm as clarified in *Fisher*, ¶¶ 36-39, and *Busta*, 276 Mont. at 369-71, 916 P.2d at 139); *Fisher*, ¶¶ 13 and 38-42; *Hinkle*, ¶¶ 23 and 29-30; *Busta*, 276 Mont. at 370-72, 916 P.2d at 138-40; *Thelen*, 238 Mont. at 85-86, 776 P.2d at 522-23 (noting that "proximate cause" is a common element in inverse condemnation and tort claims and requires proof of the asserted cause-in-fact and that the subject harm resulted therefrom "in a natural and continuous sequence, unbroken by any new, independent cause" and "without which" the subject harm "would not have occurred" – citing *Young*, 232 Mont. at 281-83, 757 P.2d at 777); *Young*, 232 Mont. at 281-83, 757 P.2d at 777 (clarifying that proximate cause encompasses distinct but related requirements for proof of causation-in-fact, under "but for" or alternative "substantial factor" test, and proof that the

57

harm at issue resulted from the subject cause-in-fact "in a natural and continuous sequence, unbroken by any new, independent cause" – internal citations omitted); *Pickett v. Kyger*, 151 Mont. 87, 100, 439 P.2d 57, 63-64 (1968).[22]   In 1996, we recognized that our tort causation jurisprudence was further complicated by redundant consideration of foreseeability of harm as both a threshold consideration of law in the duty element of a negligence claim, and also as a factual and, as applicable in a particular case, legal consideration under the proximate cause element of tort claims.  *See Busta*, 276 Mont. at 360-70, 916 P.2d at 133-38 (internal citations omitted).  We recognized further that the concept of "proximate cause" had also lost its original common law "connotations of proximity in time and space" and had become an "utter[ly] confus[ing]" and "extraordinarily changeable concept" of "chameleon quality," with "no integrated meaning of its own," to such extent that "[n]o other [legal] formula so nearly does the work of Aladdin's lamp."  *Busta*, 276 Mont. at 368-69, 916 P.2d at 137-38 (internal punctuation and citations omitted).

  E. *Busta* Clarification and Simplification of Foreseeability of Harm as a Consideration of Proximate Cause in Tort Context.

---

[22] *See also Burk Ranches, Inc. v. State*, 242 Mont. 300, 304 and 308, 790 P.2d 443, 445 and 448 (1990) (referencing cause-in-fact and proximate cause as distinct elements of a negligence claim); *Thelen*, 238 Mont. at 85-87, 776 P.2d at 522-23 (noting "proximate cause" as a "required element" in an inverse condemnation claim" but that it "has not been clearly defined in Montana law"); *Thornock v. State*, 229 Mont. 67, 72, 745 P.2d 324, 327 (1987) (describing causation element of negligence claim requires proof that the subject conduct or circumstance was the "legal cause" of the subject harm), *overruled in part on other grounds by Dukes v. Sirius Constr.*, 2003 MT 152, ¶¶ 57-58, 316 Mont. 226, 73 P.3d 781.

¶54 In 1996, we acted to eliminate the nebulous "Aladdin's lamp" character of the concept of foreseeability of harm under Montana common law in regard to both the threshold duty element of a negligence claim[23] and, as pertinent here, the causation element of tort claims. *See Busta*, 276 Mont. at 360-73, 916 P.2d at 133-40. As to the generally applicable causation element in tort claims,[24] we recognized that, with foreseeability of harm often not at issue, tort causation often involves only a question of fact for jury determination under either the causation-in-fact "but for" test or, when certain "multiple" causes-in-fact are at issue, the alternative "substantial factor" test. *Busta*, 276 Mont. at 370-71, 916 P.2d at 139-40 (overruling and abandoning the perfunctory "two-tiered analysis of causation" in every case as discussed in *Kitchen Krafters*, 242 Mont. at 168-69, 789 P.2d at 575). We nonetheless retained foreseeability of harm as a causation consideration in a more limited role in two regards. First, in cases where a defendant asserts that some other "independent intervening cause" broke or should break the "chain of causation" that otherwise may exist under the appropriate causation-in-fact test, the

---

[23] As specifically pertinent to negligence claims, we clarified that the primary role of foreseeability of harm is as a threshold question of law under the duty element of those claims. *Busta*, 276 Mont. at 370-71, 916 P.2d at 139-40. Foreseeability of harm has remained, however, as an unreferenced question of fact subsumed in the breach element of a negligence claim. *See Busta*, 276 Mont. at 372, 916 P.2d at 140 (citing Montana Pattern Jury Instruction 2.00 (rev. 2/7/91) (defining negligence as "the failure to use reasonable care" – "[n]egligence may consist of action or inaction" – "[a] person is negligent if he fails to act as an ordinarily prudent person would act under the circumstances")).

[24] While *Busta* focused on the role of foreseeability of harm in regard to the duty and causation elements of negligence claims, the common law tort causation standard applicable in negligence claims is similarly applicable in strict liability in tort claims and inverse condemnation claims. *Brishka*, ¶¶ 13 and 15 (noting "[p]roof of proximate cause is an essential element" of negligence, strict liability in tort, and Montana inverse condemnation claims).

causation element test is primarily a question of fact for proof and jury determination as to whether the conduct or circumstance at issue "helped produce" the subject harm "in a natural and continuous sequence" and whether the harm "would not have occurred without" it. *Busta*, 276 Mont. at 370-71, 916 P.2d at 139-40 (quoting Montana Pattern Jury Instruction 2.08 (rev. 11/1/89)).[25] If so, the subject conduct or circumstance was a cause-in-fact of a reasonably foreseeable type of harm. *See Fisher*, ¶¶ 38-42 (noting post-*Busta* "two-tiered" causation "analysis" in re causation-in-fact and independent intervening causation as a matter of fact); *Busta,* 276 Mont. at 370-71, 916 P.2d at 139-40 (clarifying two-tiered requirement for factual proof of proximate cause).[26] Due to the documented

---

[25] An intervening cause is a new or separate factual occurrence or circumstance that combines with the subject conduct or circumstance at issue to cause the subject harm. *See Cusenbary v. Mortensen*, 1999 MT 221, ¶ 26, 296 Mont. 25, 987 P.2d 351; *Busta*, 276 Mont. at 371-73, 916 P.2d at 139-40; Restatement (Second) of Torts §§ 440-41, 442B, and 4443 (Am. Law Inst. 1965). An intervening cause-in-fact breaks the chain of causation between the subject conduct or circumstance and resulting harm at issue only if (1) the risk of such circumstance occurring and then combining with the subject conduct or circumstances to increase the risk of harm to persons or property in the vicinity was not reasonably foreseeable under the circumstances, *Emanuel*, ¶ 13; *Larchick v. Great Falls-Billings Diocese*, 2009 MT 175, ¶ 48, 350 Mont. 538, 208 P.3d 836 (internal citations omitted); *Fisher*, ¶¶ 38-42; *Prindel*, ¶ 39; *Cusenbary*, ¶¶ 25-26 and 30-31; *Estate of Strever v. Cline*, 278 Mont. 165, 175-76, 924 P.2d 666, 671-72 (1996) (essential question is whether the occurrence of such an intervening cause was of a type reasonably foreseeable as a "significant part of the risk involved in the" subject conduct or circumstance at issue, or "so reasonably connected with it" – another cause is not an independent intervening cause only if it is one that the tortfeasor "might reasonably foresee as probable" or "reasonably anticipate under the circumstances" – internal punctuation and citations omitted); *Busta,* 276 Mont. at 362 and 370-72, 916 P.2d at 134 and 139-40 (internal citations omitted); or (2) the subject harm is under the circumstances too attenuated as a matter of law from the subject conduct or circumstance for imposition of liability based on pertinent public policy considerations, *Busta*, 276 Mont. at 361-64 and 370-72, 916 P.2d at 133-35 and 139-40 (citing *Palsgraf*, 162 N.E. at 103-04 (Andrews, J. dissenting)).

[26] In that regard, the alleged contributory negligence of a claimant is *not* an intervening cause-in-fact, but rather, a contributing cause-in-fact subject to the alternative "substantial factor" test of causation-in-fact. *Busta*, 276 Mont. at 371, 916 P.2d at 139-40.

risk of confusing lay jurors with confusing technical legal terms, we held that jury instructions generally should not include "terms such as 'proximate cause' or 'legal cause' and 'reasonable foreseeability.'" *Busta*, 276 Mont. at 371-72, 916 P.2d at 140 (concurring with similar view of California Supreme Court quoted from *Mitchell v. Gonzales*, 819 P.2d 872, 877-78 (Cal. 1991)).

¶55    Second, "[t]o the extent that foreseeability" of harm may implicate important "issues of public policy" regarding the chain of causation, we held that the court must address the question as a threshold "issue of law." *Busta*, 276 Mont. at 372, 916 P.2d at 140. In that regard, we noted Justice Andrew's dissenting view in *Palsgraf* that proximate cause necessarily includes consideration as to at what point, in the sequential chain of causation under the alleged circumstances, the alleged causal connection-in-fact between the subject conduct or circumstance and the alleged harm is too attenuated to impose liability based on pertinent public policy considerations. *See Busta*, 276 Mont. at 361-62, 916 P.2d at 133-34 (discussing *Palsgraf*, 162 N.E. at 103-04 (Andrews, J., dissenting)).[27]

      F. Application of Clarified *Busta* Formulation of Proximate Cause and Foreseeability of Harm in Consequential *Taking* and *Damaging* Inverse Condemnation Claims.

---

[27] For example, abandoning our prior public policy view, we have recognized as a matter of law that a third party's voluntary choice to consume alcoholic beverages should and may not be an independent intervening cause which breaks the chain of causation between an alcohol provider and injury to another caused by an intoxicated person who consumed it. *See Nehring v. LaCounte*, 219 Mont. 462, 469-70, 712 P.2d 1329, 1334-35 (1986); *Bissett v. DMI, Inc.*, 220 Mont. 153, 157, 717 P.2d 545, 547-48 (1986). *Accord Jevning v. Skyline Bar*, 223 Mont. 422, 424, 726 P.2d 326, 327 (1986) (applying *Nehring* and *Bissett*); *Cusenbary*, ¶¶ 25-39 (citing *Nehring* and *Jevning* in re independent intervening causes).

¶56   In contrast to the concept of proximate cause that was prevalent in common law tort jurisprudence prior to adoption of our 1889 Constitution, our inverse condemnation jurisprudence did not specifically refer to "proximate cause" or reasonable foreseeability of harm or damage until *Rauser* in 1977.  As early as 1897, however, we clearly recognized that the Montana constitutional right to just compensation for private property *damaged* for public use entitles private property owners to compensation for both general damages *and* special damages (i.e., *consequential damages*) caused by a public improvement or land use.  *Root*, 20 Mont. at 356-58, 51 P. at 155-56.  Then and now, general damages were those that are the "natural and necessary" result of the subject occurrence or circumstance, while special damages are those that are the "natural but *not* necessary" result of the occurrence or circumstance. *Purington v. Sound W.*, 173 Mont. 106, 111-12, 566 P.2d 795, 798 (1977); *Root*, 20 Mont. at 356-57, 51 P. at 155-56.  The causation standard for consequential *damaging* claims first recognized in *Root* thus tracked and essentially applied the contemporary common law tort standard of proximate cause then codified in Mont. Civ. Code § 4330 (1895) (now § 27-1-317, MCA),[28] which then and now defined the tort "measure of damages" as "the amount which will compensate for all detriment *proximately caused* . . . whether" the particular harm at issue "could have been anticipated or not."  *See Lacock*, 277 Mont. at 21-22, 919 P.2d at 375-76 (noting that pre-*Busta* articulation of proximate cause in *Kitchen Krafters*, 242 Mont. at 169, 789 P.2d at 575

---

[28] Mont. Civ. Code § 4330 (1895) (now § 27-1-317, MCA) was as adopted from the Cal. Civ. Code § 333 (1872) enactment of Section 1860 of the proposed but never-enacted David Dudley Field Civ. Code of N.Y. (1865).

(requiring proof that the subject injury was reasonably "*foresee*[*able*]" as the "*the natural and probable consequence of*" the conduct or circumstance at issue – emphasis added), was a partially correct but "incomplete" statement "of Montana law on proximate cause" that must be construed in harmony with the last clause of § 27-1-317, MCA, manifesting "that the specific injury" at issue "need not have been" foreseen); *Busta*, 276 Mont. at 360-73, 916 P.2d at 133-40 (tracing the history of the "law of foreseeability" of harm); *Spackman v. Ralph M. Parsons Co.*, 147 Mont. 500, 506, 414 P.2d 918, 921 (1966) (tort causation generally requires the subject harm to be the "natural and probable consequence" of the conduct or circumstance complained of and which "may include both the *direct and indirect*[] but reasonably probable[] results" thereof – emphasis added); *Hill v. Chappel Bros. of Mont., Inc.*, 93 Mont. 92, 104-05, 18 P.2d 1106, 1110 (1932); *Mize*, 38 Mont. at 532, 100 P. at 73 ("proximate cause" requires that the subject harm be the "natural" result of the subject conduct or circumstances, "without which the injury would not have occurred," in a "continuous sequence, unbroken by any new[] independent cause" – "it is not necessary to show that [defendant] ought to have anticipated the particular injury which did result" – construing § 6068 Rev. Codes (1907), now § 27-1-317, MCA); *Reino*, 38 Mont. at 295-96, 99 P. at 854-55 (proximate cause requires that the subject harm be of a type reasonably foreseeable or anticipated "as the probable result" of the subject conduct or circumstance but does "not require[] that the 'specific' injury[,] or 'such' an injury[,]" was reasonably foreseeable "as the natural and probable consequence of" the subject conduct or circumstances – "such consequences might be the natural and probable results"

63

even though "not . . . specifically contemplated or anticipated" – internal punctuation and citation omitted); *Palsgraf*, 162 N.E. at 100-01 (ultimately holding that the subject injury to the claimant caused by a falling scale at the other end of railroad platform was not reasonably foreseeable as a natural and probable result, in a continuous sequence, of a railroad guard helping another passenger to jump from the platform onto a moving train where the guard had no reason to suspect that the package carried by the jumping passenger might contain explosives that could detonate if dropped).[29] *See also* W.P. Keeton, *Prosser & Keeton On Torts* § 43, p. 282 (5th ed. 1984) (noting semantic "difficulties" in historic causation formulations requiring that the subject harm be the "natural and probable consequence" of the subject conduct or circumstance because those terms "appear to have . . . no more definite meaning than" the nebulous concept of "proximate" cause that they sometimes define because, "[s]trictly speaking, all consequences are 'natural' which occur through operation of forces of nature, without human intervention," "[b]ut the word, as used, obviously appears not to be intended to mean [that] at all," but rather, "to refer to consequences which are normal, not extraordinary, [and] not surprising in the light of ordinary experience" – if the term "[p]robable" "is to add anything" in this context it "must refer to consequences which were to be anticipated at the [subject] time" and thus "appears

---

[29] Further manifesting the consistent application of the common law proximate cause standard to Montana inverse condemnation claims from the outset, we recognized early on, in recognizing the even broader "taken or damaged" protection first provided in our 1889 Constitution, that "[c]onstitutions which provide that 'private property shall not be *taken* for public use without just compensation' are but declaratory of the [preexisting] common law." *Less*, 28 Mont. at 32, 72 P. at 141 (emphasis original). *Accord Brishka*, ¶ 15; *Deschner*, ¶ 19; and *Thelen*, 238 Mont. at 86, 776 P.2d at 523.

to come out as the equivalent of the test of foreseeability" in regard to the range of likely "consequences within the scope of the original risk" – altered punctuation and emphasis added).

¶57 Consequently, reconciling *Root*, *Less*, and a correct reading of *Rauser* with *Busta*, the essential elements of proof of a consequential *damaging* inverse condemnation claim are: (1) substantial physical damage or interference to or with private property; (2) caused by the construction or operation of a public improvement or land use (with causation determined under our clarified common law causation standards specified in *Busta*, 276 Mont. at 370-72, 916 P.2d at 139-40, which carry forward the historical requirements of proximate cause and foreseeability of harm as clarified); (3) the subject property damage or interference is of a type or extent uncommon to the deleterious effect to which the improvement at issue commonly subjects the public or community at large (as recognized in *Adams*, 230 Mont. at 401-02, 753 P.2d at 851 (quoting 5 *Nichols on Eminent Domain*, § 16.101[2], p. 6-13), and *Root*, 20 Mont. at 356-60, 51 P. at 155-57); and (4) actual pecuniary loss. Under the causation element of the claim in accordance with *Busta*, in cases where there is no defense assertion that some cause other than the construction or operation of the subject public improvement or property use was the cause of the alleged property damage or interference, the causation element simply requires proof of causation-in-fact under the single cause "but for" test. *Busta*, 276 Mont. at 370-71, 916 P.2d at 139. However, in cases "where [the] chain of causation" is at issue (i.e., where the defendant asserts that some cause other than the construction or operation of the subject

65

public improvement or property use was the independent intervening cause of the alleged property damage or interference, and thus breaks the chain of causation and cuts off the defendant's liability), the causation element of the claim requires more stringent factual proof and jury determination that the subject public improvement or use "helped produce" the claimed property damage or interference "in a natural and continuous sequence," and that the damage or interference "would not have occurred without" it. *Busta*, 276 Mont. at 370-71, 916 P.2d at 139-40 (quoting Montana Pattern Jury Instruction 2.08 (rev. 11/1/89)). But, in a case where the defendant asserts that, regardless of a natural and continuous sequential chain of causation-in-fact, pertinent public policy considerations warrant truncation of the chain of causation and liability between the subject public improvement or use and the ultimate private property damage or interference, the court must address that question as a threshold matter of law. *See Busta*, 276 Mont. at 371-72, 916 P.2d at 139-40 (referencing *Palsgraf*, 162 N.E. at 103-04 (Andrews, J., dissenting), as earlier discussed at 276 Mont. at 361-62, 916 P.2d at 133-34); *Rauser*, 172 Mont. at 538-39, 565 P.2d at 637-38 (referencing *ad hoc* California public policy considerations from *Albers*, 398 P.2d at 136-37, as "guides" "applicable to [that] case" in re "unplanned for problems [that] arise [and] damage adjacent property" in absence of any tortious conduct). In such case, the court must consider and balance as a threshold matter of law the following offsetting public policy considerations:

> (1)    whether the risk of such harm is so remote or attenuated in sequence in the absence of tortious conduct that the imposition of liability under such circumstances would pose a significant risk of increasing public costs and

66

liability to such extent to impede or deter the continued provision of such beneficial public improvements or works; and

(2)     whether the burden of paying for such non-tortious property damage or interference is more readily and fairly absorbed by the taxpayers as a whole, who are the collective beneficiaries of such public improvements or works, with significantly less hardship than would be experienced by the peculiarly-damaged individual property owner(s).

*See Kafka*, ¶ 69 ("even when a compensable property interest still retains economic value" court must consider whether "justice and fairness require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons" – citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S. Ct. 2646, 2659 (1978) (in re *ad hoc* considerations applicable in regulatory takings cases) – internal punctuation omitted); *Rauser*, 172 Mont. at 538-39, 565 P.2d at 637-38 (referencing *ad hoc* California public policy considerations from *Albers*, 398 P.2d at 136-37, as "guides" "applicable to [that] case" in re "unplanned for problems [that] arise [and] damage adjacent property" in absence of any tortious conduct); *Biron v. City of Redding*, 170 Cal. Rptr. 3d 848, 856-57 (Cal. Ct. App. 2014) ("courts must balance the interests of property owners, who should not be required to contribute more than their fair share to the public undertaking, with the possibility that imposing open-ended liability on public entities charged with creating and maintaining" such necessary and beneficial public improvements and works "will discourage the[ir] development" – the fact that resulting "harm is foreseeable does not necessarily mean the public entity is unreasonable in failing to protect against it if the probability, frequency, and magnitude of the damage is low in relation to the cost and ability to protect against the harm" – internal

punctuation and citation omitted); *Adams*, 230 Mont. at 401, 753 P.2d at 850-51 (noting risk of opening "Pandora's Box" of governmental liability for adverse effects of public roadway development and improvement and that the "wheels of progress shall not be slowed" where the deleterious effects on residential use also correspondingly increase the value and utility of the property for commercial use); *Busta*, 276 Mont. at 361-62 and 371-72, 916 P.2d at 133-34 and 139-40 (citing *Palsgraf*, 162 N.E. at 103-04 (Andrews, J., dissenting), in re foreseeability of harm as a function of "practical politics").

¶58     Accordingly, as we have in other contexts post-*Busta*, *see, e.g.*, *Lacock*, 277 Mont. at 22, 919 P.2d at 376 (holding that pre-*Busta* articulation of proximate cause reasonable foreseeability requirement was an incomplete statement of the law and that the subject tort claim "must be retried pursuant to our" *Busta*-clarified causation standards), it is time for this Court to similarly reconcile the still nebulously-stated proximate cause element of consequential *taking* and *damaging* inverse condemnation claims, with our *Busta*-clarified formulation of common law causation.  Only by doing so, and concomitantly abandoning our continued over-reading of *Rauser*, can this Court finally clean up the analytical imprecision and inconsistency that, as of today, now further plagues our consequential *damaging* inverse condemnation jurisprudence with an archaic, nebulous, and inconsistent standard of causation, unique to inverse condemnation claims, and which is further artificially limited by the manifestly superfluous, and never heretofore adopted, "as deliberately planned and built" language clipped out of context without analysis from

68

California public policy considerations unnecessarily referenced in *Rauser*, a case that was not even a consequential *damaging* case.

    5. Flaws in Application of Court's Analysis to Factual Record Underlying Wittmans' Consequential *Damaging* Here.

¶59   In applying its new and uniquely restrictive "deliberately planned and built" causation standard here, the Court reasons that the subject raw sewage backup into the Wittmans' basement was not a constitutional *damaging* because:

> the record does not reflect that the City deliberately planned and built its sewer system in such a way that made [such property] damaging . . . *foreseeable*. [It] designed its system to accomplish disposal of "toilet paper, fecal matter, and urine," not to accommodate the improper disposal of other products [of which] no sewer system is capable of . . . accommodat[ing]. . . . [T]he system, "as planned and built," did not *proximately cause* the damage to Wittmans' property . . . [because] this backup was caused by misuse of the system."

Opinion, ¶ 26 (emphasis added).   The Court's rationale is patently flawed in multiple regards.

¶60   First and foremost, as we often previously did in the tort context before *Busta*, the Court's cursory analysis not only continues to use the archaic and hopelessly nebulous "proximate cause" terminology now abandoned in the tort context, but then once again circularly analyzes foreseeability of harm as a causation consideration separate and distinct from proximate cause.   Moreover, the Court's additional coupling of the foreseeability of harm requirement with the anomalous "deliberately planned and built" language above and beyond the traditional proximate cause standard—a causation standard supposedly equally applicable in inverse condemnation claims as in tort—effectively creates a new and more

69

restrictive causation standard that further requires proof that the subject property damage have been a specifically contemplated, i.e., planned-for, consequence of the subject public improvement.[30] Until today, however, nothing in our tort and inverse condemnation causation jurisprudence even hinted at a heightened causation standard that would not only require proof that a public improvement was the cause-in-fact of a reasonably foreseeable type of offsite private property damage, but also proof that the subject public entity deliberately or specifically contemplated that the public improvement would cause that specific type of offsite damage to private property. As previously noted, *supra*, it is long-and well-settled, both pre- and post-*Busta*, that reasonable foreseeability of harm does not require that the particular harm, or mechanism, manner, or type of harm, at issue be a reasonably foreseeable result, much less a "deliberate" or specifically planned-for result, of the subject conduct or circumstance—it requires only that it be of a *type* within the scope or zone of reasonably foreseeable *risk*, as that component of proximate cause is now subsumed as matters of fact and law in our *Busta*-clarified causation standards.

¶61 Second, the Court's analysis inaccurately cites and applies our holdings in *Knight-Billings*, *Rauser*, and *Less* as illustrative of its newly-recognized "as deliberately planned and built" causation standard for *consequential damaging* inverse condemnation claims. Opinion, ¶ 28 (asserting that those cases illustrate by contrast "the lack of foreseeability" that the City sewer system would cause the raw sewage backup into the

---

[30] If not, the anomalous "as deliberately planned and built" language adds nothing to the causation analysis and is indeed superfluous despite the Court's protestation to the contrary.

Wittmans' home). However, as a threshold analytical matter, neither *Knight-Billings*, nor *Rauser*, were *consequential damaging* inverse condemnation cases. As previously noted, *Knight-Billings* was a regulatory *taking* case involving restrictive zoning regulation that so significantly and disparately restricted the "use and marketability" of the plaintiffs' properties for government-required residential use to be tantamount to a "taking" of those properties for public use. *See Knight-Billings*, 197 Mont. at 173-74, 642 P.2d at 145. *Rauser* was a consequential *taking* case involving consequential damage to adjacent private property so substantial and comprehensive to be tantamount to an actual physical appropriation or ouster of the owner from use of the property. *Rauser*, 172 Mont. at 533-38 and 543, 565 P.2d at 635-37 and 640 (expressly characterizing the claim as a "taking" and the property as having been "taken"). Even so, while the Court correctly notes that the government entities intentionally designed and built the subject public improvements to substantially increase traffic in *Knight-Billings*, significantly lower the adjoining city street grade in *Less*, and with knowledge that the irrigation district improvements in *Rauser* would flood adjoining private property, nothing in any of those cases expressly or implicitly held that successful prosecution of the various types of inverse condemnation claims at issue depended on proof that the subject public improvements were designed and built with the deliberate intent or contemplation that they would cause the specific types of private property damage at issue in those cases. *See Knight-Billings*, 197 Mont. at 168-74, 642 P.2d at 143-46; *Rauser*, 172 Mont. at 537-39, 565 P.2d at 637-38; *Less*, 28 Mont. at 31-34, 72 P. 141-42. To the extent that causation was at issue in those cases, *Rauser*

71

required only that the subject private property damage was a "reasonabl[y] foreseeable consequence of the undertaking." *Rauser*, 172 Mont. at 538, 565 P.2d at 637.[31]  In *Knight-Billings* and *Less*, causation, whether causation-in-fact or the foreseeability of the subject private property damage, was not even at issue. *See Knight-Billings*, 197 Mont. at 168-74, 642 P.2d at 143-46; *Less*, 28 Mont. at 31-33, 72 P. 141-42.  Thus, contrary to the Court's assertion in Opinion, ¶ 28, those cases clearly do *not* by contrast illustrate "[t]he lack of foreseeability" of the subject harm here.

¶62    Third, the primary support for the Court's assertion that the subject raw sewage backup into the Wittmans' home was not reasonably foreseeable for purposes of causation is its isolated citation to the low "statistical possibility" of such an occurrence on the evidentiary record here.  The fallacy of that reasoning is belied by the Court's manifest disregard of the slew of other material facts in this case.  Despite the Court's narrow focus on the superficially deceptive statistical data regarding the relatively low number of sewer backups in Billings, the City acknowledges that 10-15 raw sewage backups from its sewer system onto private property occur each year.  The Court's cursory analysis further

---

[31] We merely noted in *Rauser* that the consequential property damage or interference at issue was in fact inevitable *on the particular evidentiary record in that case*, and thus readily satisfied the lesser proximate cause requirement that the subject damage be a reasonably foreseeable result of the subject improvement. *See Rauser*, 172 Mont. at 536-38, 565 P.2d at 636-37. *See similarly Root*, 20 Mont. at 356-60, 51 P. at 155-57 (noting that the subject interference with use of the adjacent private property was "not a natural and necessary result" of the subject railroad operation but nonetheless constitutionally compensable on remand upon pleading and proof that it was "damage[] . . . specially sustained" as a "natural" but "not the necessary" consequence of the improvement).

similarly ignores various other material facts not subject to genuine dispute on the Rule 56 record in this case:

(1)     the Wittmans' service line laterally connected to the City sewage main was installed in 2007-09 and "is relatively new";

(2)     there is no evidence upon which to reasonably conclude or suspect that the Wittmans' service line was improperly installed or maintained in deviation from City system specifications;

(3)     sewage backup into an upline property service line, with resulting property damage, is an inherent and significant risk in the event of a blockage in a City sewage main as the system is currently designed and operated;

(4)     as candidly acknowledged by the City Public Works director (Scott Emerick), grease disposal, whether residential or commercial, into the City sewer system will inevitably accumulate on sewer "pipe walls" and "keep[] collecting until it eventually chokes off the pipe" flow;

(5)     the City has long been aware that the flushing of grease and other insoluble substances (such as non-toilet paper disposable wipes) is a common occurrence in the operation of municipal sewer systems and thus will inevitably result in sewer main backups into upline service lines, to wit:

> [Y]ou can't control what people flush.  So . . . *you're always going to have* some [*sewer main backups* into service lines].  I don't care what system you look at. . . . [*E*]*very community has sanitary sewer overflows*.  You could have a brand new system similar to this, and you're going to have [backups] because somebody's flushing something that they shouldn't be in the wastewater stream. . . .  [Question:] And that's just kind of a *necessary part of the design* of these systems?  [Answer:] That's correct.  [(Emphasis added)];

(6)     the City's retained sewer system expert (City of Bozeman Public Works official John Alston) similarly acknowledged that the flushing of grease, fats, oils, and other non-soluble "trash" into municipal sewer systems is an "inherent" "nationwide" problem despite that municipal sewer systems are not designed to handle such substances and materials and that the City discourages and "does not plan" for them;

(7)   the City has occasionally used newspaper and Internet ads to implore residents to avoid flushing grease into the sewer system, and has even enacted an ordinance prohibiting industrial grease discharges in excess of a specified tolerance.  However, the ordinance does not apply to residential users;

(8)   10-15 City sewage main backups into homes and businesses occur on average per year, largely attributed to sewage main grease accumulation;

(9)   a grease accumulation in a down-line City sewer main was the sole cause of a sewer main blockage that resulted in the subject backup of approximately 1,000 gallons of raw sewage into the Wittmans' home and resulting property damage;

(10)  the City sewer system, as currently designed and operated, helped produce the subject sewage main clog, sewage backflow, and resulting property damage in a natural and continuous sequence, in conjunction with the common grease discharge practice of its users (which, though undesirable, is not illegal), and which backflow and damage would not have occurred without the system as currently designed and operated;

(11)  there is no evidence upon which to reasonably conclude or suspect that the subject grease accumulation, clog, and sewage backup was the result of negligence or other tortious conduct by the City in the design, construction, maintenance, or operation of the system; and

(12)  there is no evidence upon which to reasonably conclude or suspect that the Wittmans in particular caused or otherwise helped bring about the subject grease accumulation, resulting sewer main clog, or sewage backup.

Based on the totality of the record facts in this case, it is thus beyond genuine material dispute that raw sewage backups from the City sewer system onto private property, such as occurred here, are a known and reasonably foreseeable risk of harm associated with the system as currently designed and operated.[32]

---

[32] Unlike the municipal defendant in *Oroville*, the City of Billings does not require its sewer system users to install and maintain functioning backwater valves on their service line laterals, *see Oroville*, 446 P.3d at 307-09, nor has it made any assertion, much less evidentiary showing as to the technical and financial feasibility or cost-benefit analysis of doing so.

¶63 Fourth, the Court further asserts that the City sewer system "did not proximately cause the damage to Wittmans' property" because it "was caused by misuse of the system." As a preliminary matter, the Court correctly points out that it is beyond genuine material dispute that the "City designed its system to accomplish disposal of 'toilet paper, fecal matter, and urine,' not to accommodate improper disposal of other products [of which] no sewer system is capable of . . . accommodat[ing]." It is similarly beyond genuine material dispute that the undesirable flushing of grease and other insoluble substances by sewer system users is the primary cause of sewage system backups into upline service lines. However, in essence, the Court's assertion, tracking the City's assertion, is no more than an assertion that the cause of the subject sewage backup, and resulting property damage, was misuse of the system by system users combined with the limitation of the City sewer system as designed and operated. In other words, by operation of applicable causation principles, the City sewer system and third-party misuse thereof were both contributing causes-in-fact that combined to cause the subject damage to Wittmans' property. Thus, to the extent that it asserts that misuse of the system was the precipitating cause of the subject harm, rather than the limitations of the sewer system, the Court is essentially asserting that third-party misuse of the system was an independent intervening cause that broke the chain of causation-in-fact between the sewer system and resulting sewage backup damage to the Wittmans' home.

¶64 However, whether pre- or post-*Busta*, the problem with the Court's reasoning is that, as a matter of law, an intervening cause breaks the chain of causation between a

75

contributing antecedent cause-in-fact only if the intervening cause was of a type *not* reasonably foreseeable to occur and combine with the antecedent cause to cause the resulting injury at issue. *Larchick v. Great Falls-Billings Diocese*, 2009 MT 175, ¶ 48, 350 Mont. 538, 208 P.3d 836; *Fisher*, ¶¶ 38-42; *Prindel*, ¶ 39; *Hinkle*, ¶¶ 29-30; *Cusenbary v. Mortensen*, 1999 MT 221, ¶¶ 25-26 and 30-31, 296 Mont. 25, 987 P.2d 351; *Estate of Strever v. Cline*, 278 Mont. 165, 175-79, 924 P.2d 666, 671-74 (1996); *Busta*, 276 Mont. at 360-66 and 370-72, 916 P.2d at 133-36 and 139-40 (internal citations omitted); *Sizemore v. Mont. Power Co.*, 246 Mont. 37, 47, 803 P.2d 629, 635-36 (1990); *Kitchen Krafters*, 242 Mont. at 168, 789 P.2d at 574-75; *Goodnough v. State*, 199 Mont. 9, 16, 647 P.2d 364, 367-68 (1982); *Halsey v. Uithof*, 166 Mont. 319, 327-28, 532 P.2d 686, 690-91 (1975); *Gilligan v. City of Butte*, 118 Mont. 350, 357-58, 166 P.2d 797, 801 (1946); *Burns v. Eminger*, 84 Mont. 397, 408, 276 P. 437, 442 (1929); *McCloskey v. City of Butte*, 78 Mont. 180, 184-88, 253 P. 267, 268-69 (1927); W.P. Keeton, *Prosser & Keeton On Torts* §§ 44-45, at 301-321 (5th ed. 1984). *See also Thelen*, 238 Mont. at 85-86, 776 P.2d at 522-23 (noting that "proximate cause" is a common element in inverse condemnation and tort claims and requires proof of the asserted cause-in-fact and that the subject harm resulted therefrom "in a natural and continuous sequence, unbroken by any new, independent cause" and "without which" the subject harm "would not have occurred"). Here, the City's retained sewer system expert acknowledged that the flushing of grease, fats, oils, and other non-soluble "trash" into municipal sewer systems is an "inherent" "nationwide" problem despite that municipal sewer systems are not designed to handle

76

such substances and materials and that the City discourages and "does not plan" for them. It is further beyond genuine material dispute on the Rule 56 record that, with knowledge of such misuse, the City of Billings has occasionally used newspaper and Internet ads to implore residents to avoid flushing grease into the sewer system and has enacted an ordinance prohibiting industrial grease discharges in excess of a specified tolerance. Significantly, however, the ordinance does not apply to the disproportionately larger number of residential users. Under these circumstances, the misuse of the sewer system asserted by the Court and City as the precipitating cause of the backup of raw sewage into the Wittmans' home was not only a reasonably foreseeable occurrence associated with the design and operation of its sewer system, but a well-known occurrence and resulting contributing cause-in-fact of sewer system backups, and resulting property damage, including the subject backup and damage to the Wittmans' home. Thus, the Court's finding and holding that misuse of the system, rather than its design and operational characteristics, was the sole cause of the Wittmans' property damage is patently erroneous.

¶65    Fifth, the Court further cursorily distinguishes the Wittmans' property damage from a constitutionally compensable *damaging* of private property by characterizing it as merely "an incidental or inadvertent *consequence* of the operation of the [City sewer] system." Opinion, ¶ 27 (emphasis added). Aside from the lack of supporting authority giving any legal significance to that distinction, the Court's characterization of the subject property damage as a "consequence of the operation of the system" is a manifest recognition that the sewer system was a contributing cause-in-fact of that damage.

77

¶66 Based on isolated language snipped out of context from *Less*, the Court similarly attempts to distinguish Wittmans' property damage as "a 'temporary spoliation or invasion of the property.'" Opinion, ¶ 27 (quoting *Less*, 28 Mont. at 32, 72 P. at 141). In context, however, the source of the quoted snippet from *Less* was a Georgia case noting that, in contrast to constitutional provisions that protect only against the *taking* of private property, a constitutional provision that more broadly protects against the *taking* or *damaging* of private property requires compensation for "*any* damage" to private property caused by a public improvement, regardless of whether "immediate and direct" or merely "consequential damage," *including* "temporary spoliation or invasion of the property." *Green*, 67 Ga. at 387-89 (emphasis added). Thus, in context, the isolated language snipped by the Court from *Less* to deny compensation to the Wittmans in fact contrarily recognized that the Montana constitutional right to compensation for private property *damaged* by a public improvement applies to any "consequential damage" to private property caused by a public improvement, *including* "temporary spoliation or invasion of the property." *See Less*, 28 Mont. at 32, 72 P. at 141 (quoting *Green* in conjunction with *Root*, *inter alia*).

¶67 Sixth, as we have since *Rauser*, the Court continues to erroneously conflate principles unique to consequential *takings* with the broader "or damaged" protection provided by Article II, Section 29. The Court twice notes that *Rauser*, as "reaffirmed" in *Knight-Missoula*, requires that "'the extent of [the claimed damage] be of such a degree' as to constitute 'a *taking* of an interest in the property damaged,'" Opinion, ¶¶ 22-23 (citing *Rauser* and *Knight-Missoula* – emphasis added). It then further asserts that:

78

> [f]or a damage claim less than a complete taking, the property must have been damaged to such a degree as to constitute a *permanent taking of the property*, and *not merely* have caused . . . *temporary damage* [to the property].

Opinion, ¶ 25 (emphasis added). The Court thus concludes that "we cannot conclude that 'the extent of that damage'" to the Wittmans' property was "'of such a degree as to amount to a *taking* of an interest in the property damaged.'" Opinion, ¶ 27 (quoting *Rauser* – emphasis added).

¶68 However, as previously noted, neither *Knight-Missoula,* nor *Rauser,* were consequential *damaging* cases—they were *takings* cases. *See Knight-Missoula,* 252 Mont. at 240, 827 P.2d at 1275 (analyzing the indiscriminately pled inverse condemnation claim as a consequential and/or regulatory *taking* claim based on claimed interference with private property rights caused by the deleterious effects of increased public use of the roadway and the City's refusal to close it and noting that "a question of fact" remained as to whether "a *taking*" occurred – emphasis added); *Rauser,* 172 Mont. at 533-38 and 543, 565 P.2d at 635-37 and 640 (expressly characterizing the consequential effect of the subject improvement as "taking" and the property having been "taken" because the consequential property damage to the adjacent private property was so substantial and comprehensive to be tantamount to an actual physical appropriation or ouster of the owner from use of the property). The Court's unsupported assertions in Opinion, ¶¶ 22-23, 25, and 27, that a compensable consequential *damaging* occurs only if the extent of the claimed damage is of such a degree to constitute a *taking* of an interest in the property damaged by the public improvement, is patently inconsistent with the broader "taken or damaged" protection

expressed in Article II, Section 29. Thus, as recognized in *Root*, *Less*, and their cited internal authority, the Montana constitutional right to compensation for private property *damaged* by a public improvement does not depend on proof that the subject private property was damaged to such an extent to be tantamount to a *taking* of any part or interest in the property.

¶69 Seventh, further compounding its manifest mischaracterization of isolated language snipped out of context from *Less* with its erroneous conflation of consequential *taking* and *damaging* claims, the Court erroneously asserts that a compensable consequential *damaging* of private property does not occur unless the public improvement causes "permanent" damage to the property, as distinct from mere "temporary spoliation" or "infringement" upon the right to use and enjoy private property. *See* Opinion ¶¶ 20 and 25. However, as previously demonstrated, *supra*, the "temporary spoliation or invasion" language lifted from *Less* does not support the Court's assertion. Nor does the "mere infringement of the owner's personal pleasure or enjoyment" language similarly cherry-picked from *Less*. In context, *Less* merely recognized that, in contrast to the "mere infringement of the owner's personal pleasure or enjoyment" the Montana right to compensation for private property *damaged* by a public improvement applied only to actual "damage to the property itself," rather than "mere infringement of the owner's personal

pleasure or enjoyment." *Less*, 28 Mont. at 33-34, 72 P. at 141-42 (citing *Eachus v. Los Angeles Consol. Elec. Ry. Co.*, 37 P. 750, 751 (Cal. 1894)).[33]

¶70 We have long recognized, moreover, that the constitutionally required compensation for consequential *damage* to private property caused by a public improvement includes, *inter alia*, costs incurred to repair temporary physical property damage. *See Eby*, 55 Mont. at 126, 173 P. at 1166-67 (consequential damaging inverse condemnation claim in re consequential cost of restoring access to adjoining private property impaired upon significant increase in city street grade – "plaintiff should be reimbursed to the extent of the injury to the property" including "the cost of repairing" "[i]f the injury is easily reparable" and the cost "reasonable" – quoting 3 *Sedgwick on Damages*).[34] *See also State ex rel Vol. Mining Co. v. McHatton*, 15 Mont. 159, 161-62, 38

---

[33] *Eachus* further noted, *inter alia*, that the private property owner is entitled to compensation for "the entire damage . . . sustained by the act of the defendant" in the construction of the subject public improvement. *Eachus*, 37 P. at 753.

[34] *See similarly Primetime Hospitality, Inc. v. City of Albuquerque*, 206 P.3d 112, 116-25 (N.M. 2009) (private property owner right under state constitutional "taken or damaged" provision to consequential damages for lost profits and additional construction costs resulting from water damage caused by accidental rupture of city water line encroaching on private property). Even the more limited Fifth Amendment right to just compensation for private property *taken* for public use includes compensation for property and property interests only temporarily taken. *See United States v. Pewee Coal Co.*, 341 U.S. 114, 119-20, 71 S. Ct. 670, 673 (1951) (Reed, J., concurring) (temporary Fifth Amendment taking – right to compensation for temporary government occupancy and use of a private coal mine to avert nationwide coal miners strike – internal citations omitted); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 3, 69 S. Ct. 1434, 1436-37 (1949) (private owner right to just compensation for temporary government occupancy and use of a private commercial laundry plant and equipment for use "as a laundry for [Army] personnel"); *United States v. General Motors Corp.*, 323 U.S. 373, 374-83, 65 S. Ct. 357, 358-61 (1945) (private owner right to just compensation for "temporary [government] occupancy of a portion of a leased building . . . taken from a tenant who [held the property] under a long term lease"); *Vaizburd v. United States*, 384 F.3d 1278, 1285-87 (Fed. Cir. 2004) (temporary Fifth Amendment taking – right to compensation for consequential cost of removing sand accretion caused by nearby

81

P. 711, 712-13 (1894) (1889 Mont. Const. art. III, § 14 right to "just compensation" includes the right to compensation for "temporary use and injury" to property by the condemnor prior to final compensation determination for property to be taken by statutory condemnation).

¶71 Finally, also for the first time, the Court erroneously suggests, if not outright holds, that the question of a whether a compensable consequential *taking* or consequential *damaging* has occurred under Article II, Section 29 depends, at least in part, on the balancing or distinction between "impacts upon private property occasioned by the exercise of police power" and "the extent of the benefit to the public health, safety, and welfare as compared to the magnitude of the interference with or impact upon private property rights." Opinion, ¶ 24 (citing *Mont. Dep't of Highways v. City of Helena* (*Highways*), 193 Mont. 441, 445-46, 632 P.2d 332, 335-36 (1981) (distinguishing between "a legitimate use of the police power for which no compensation is required" and a "*taking* in the constitutional sense" – emphasis added)). However, the Court's reasoning manifestly conflates the inherent government power of eminent domain, as limited by the Fifth Amendment *takings*

_____

government beach replenishment project); *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1354-59 (Fed. Cir. 2003) (temporary Fifth Amendment taking – right to compensation for consequential costs of curative and preventive storm drainage runoff onto adjacent private property). *Accord City of Boulder v. Fowler Irrevocable Trust 1992-1*, 17 P.3d 797, 802-03, and 805-07 (Colo. 2001) (private property owner right under state constitutional "taken or damaged" provision to compensation for restoration costs regarding damage caused by temporary government occupancy and use of private property as a public construction project staging site – applying Restatement (Second) of Torts § 929 (1979) in state inverse condemnation context).

clause and Article II, Section 29, with the substantive due process protections implicit in the Fourteenth Amendment and Article II, Section 17, of the Montana Constitution.

¶72 The State inherently has broad police power to regulate private conduct and affairs as provided by law in furtherance of the public health, safety, and welfare. *City of Billings v. Herold*, 130 Mont. 138, 141, 296 P.2d 263, 264 (1956); *Ruona v. City of Billings*, 136 Mont. 554, 557-60, 323 P.2d 29, 30-32 (1958); *Cunningham v. NW. Improvement Co.*, 44 Mont. 180, 206-09, 119 P. 554, 560-61 (1911). The police power of the state and local governments generally relates to the government power of eminent domain, whether affirmatively exercised pursuant to the statutory condemnation process or as implicated by the doctrine of inverse condemnation, only to the extent that the government presumably does not violate a private property owner's federal and state constitutional rights to substantive due process when it affirmatively condemns or otherwise *takes* or *damages* private property for public use. *See Murr*, __ U.S. at __, 137 S. Ct. at 1942 (noting government police power to regulate the use of private property "to a certain extent" but that a regulatory *taking* of the property will result "if [the] regulation goes too far" – internal citation omitted). If not, the government action is subject to nullification under the applicable standard of constitutional review as a violation the owner's fundamental federal or state right to substantive due process. *See Clark Fork Coal. v. Mont. Dep't of Nat. Res. & Conservation*, 2021 MT 44, ¶ 48, 403 Mont. 225, 481 P.3d 198 (strict scrutiny standard of substantive due process review applicable to government action infringing on fundamental constitutional rights – internal citations omitted); *In re S.M.*, 2017 MT 244,

83

¶¶ 16-17, 389 Mont. 28, 403 P.3d 324 (substantive due process protection bars substantial government infringement of fundamental constitutional rights except upon government showing that the government action is narrowly tailored to further a compelling government interest – citing *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 2268 (1997)); *Mont. Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶¶ 21-33, 382 Mont. 256, 368 P.3d 1131 (rational basis standard of substantive due process review applicable to government exercises of police power that do not infringe fundamental constitutional rights); *Hardy v. Progressive Specialty Ins. Co.*, 2003 MT 85, ¶¶ 35-45, 315 Mont. 107, 67 P.3d 892 (applying rational basis standard of substantive due process scrutiny to statute prohibiting "stacking" of motor vehicle liability insurance coverages); *Newville v. Dep't of Fam. Servs.*, 267 Mont. 237, 249-52, 883 P.2d 793, 800-02 (1994) (substantive due process guarantee bars arbitrary government action and thus bars the exercise of government police power not rationally related to a legitimate government interest – internal citations omitted); *Cole v. City of Memphis*, 839 F.3d 530, 537-39 (6th Cir. 2016) (applying intermediate scrutiny standard of substantive due process review to city police practice of "sweeping" entertainment district streets of people after-hours); *Lutz v. City of York*, 899 F.2d 255, 268-70 (3rd Cir. 1990) (applying intermediate scrutiny standard of substantive due process review to ordinance prohibiting "cruising" on certain major city arterials).[35]

---

[35] *See also Driscoll v. Stapleton*, 2020 MT 247, ¶¶ 38-40 and 54-56, 401 Mont. 405, 473 P.3d 386 (Sandefur, J., dissenting) (discussing strict, intermediate or middle-tier, and rational basis standards of substantive due process scrutiny); *Hutchins v. District of Columbia*, 188 F.3d 531, 563 n.24 (D.C. Cir. 1999) (Rogers, J., dissenting) (noting that "[i]ntermediate scrutiny emerged from [Fourteenth Amendment] equal protection and First Amendment jurisprudence[] but is also appropriate in due process case[s]" – internal citations omitted).

¶73     In contrast, the Fifth Amendment and Article II, Section 29 neither require, nor implicate, nullification of the government action that results in a *taking* or *damaging* of private property without compensation.  The federal and state constitutional remedy for a de facto *taking* or *damaging* of private property for public use is an inverse condemnation claim for just compensation.  *Cottonwood*, ¶ 20 (internal citations omitted).  *See also* Mont. Const. art. II, § 29; U.S. Const. amend. V; *McTaggart v. Mont. Power Co.*, 184 Mont. 329, 336, 602 P.2d 992, 997 (1979).  *See also, e.g.*, *Kafka*, ¶¶ 67-69 (in re regulatory *taking* analysis – internal citations omitted); *Yellowstone Valley Elec. Co-op., Inc. v. Ostermiller*, 187 Mont. 8, 13-16, 608 P.2d 491, 494-96 (1980) (holding that statute requiring power line owners and operators to raise overhead power lines to accommodate moving of structures and derricks was not so restrictive of private property rights to effect a regulatory *taking* of property); *Billings Properties, Inc. v. Yellowstone Cty.*, 144 Mont. 25, 29-36, 394 P.2d 182, 185-88 (1964) (holding that statutory requirement for dedication of park land as a condition of local government subdivision approval was valid exercise of government police power in furtherance of public welfare thus satisfying due process rational basis scrutiny without effecting a *taking* because state law did not require subdividers to subdivide their land and that park dedication was thus merely a reasonable police regulation if they choose to do so – internal citations omitted).  *Compare Kafka*, ¶¶ 126-29, 139, 148-49, and 150-51 (Nelson, J., dissenting) (distinguishing analytical role of government police power in substantive due process analysis from regulatory *takings* analysis – internal citations omitted).  Though now abandoned in Fifth Amendment *takings* jurisprudence, the conflation of the rational

basis standard of substantive due process review with the distinct Fifth Amendment *takings* analysis caused, or at least substantially contributed to, the analytical "muddle" that long plagued the Fifth Amendment regulatory *takings* analysis from which the Montana constitutional regulatory *takings* analysis derived. *See* Bradley C. Karkkainen, *The Police Power Revisited: Phantom Incorporation and the Roots of the Takings "Muddle,"* 90 Minn. L. Rev. 826, 827-913 (2006) (describing Fifth Amendment regulatory *taking* jurisprudence as a "doctrinal muddle" lacking "theoretical coherence" in large part due to historical conflation of Fifth Amendment *takings* analysis and Fourteenth Amendment substantive due process limitation on government police power regulation of private property use). Citing *Highways*, *Ostermiller*, and *McTaggart* in Opinion, ¶ 24, the Court now similarly muddles our Montana consequential *taking* or *damaging* jurisprudence by conflation with the substantive due process limitation on government police power regulation of private property use.

¶74   As a threshold matter, *Highways*, *Ostermiller*, and *McTaggart* are all analytically distinguishable because, unlike here, they involved alleged *takings*, not an alleged consequential *damaging* of private property caused by a nearby public improvement. *Highways* arose from a contract dispute between the State and City of Helena over the allocation of the costs associated with the agreed relocation of certain City utilities from a city street in conjunction with State designation and improvement of the street as a federal aid state highway. *Highways*, 193 Mont. at 442-43, 632 P.2d at 333. The City asserted that a statute requiring it to pay 25% of the costs incurred in relocation of its utilities from

the street to facilitate the federal aid state highway improvement constituted an "exercise of [state] eminent domain power," and thus effected state *taking* of the City's "private property" without just compensation in violation of Article II, Section 29. *Highways*, 193 Mont. at 443-45, 632 P.2d at 334-35. Aside from the City's apparently unchallenged fantastical claim that its public utility facilities under the street were "private property," we held that the federal aid highway cost allocation statute did not effect a constitutional *taking* because the City's right to place utilities in the street was subject to the State's statutory power to assume control of the street for use as a state highway. *Highways*, 193 Mont. at 447, 632 P.2d at 335-36. *See similarly Ostermiller*, 187 Mont. at 13-15, 608 P.2d at 494-95 (holding that statute requiring power line operators to raise overhead power lines to accommodate moving of structures did not effect a *taking*); *McTaggart*, 184 Mont. at 333-36, 602 P.2d at 995-97 (holding that statute requiring power utility to relocate power lines from previously acquired utility easement at its expense upon landowner request effected a constitutional *taking*).

¶75 Even to the extent that they ultimately applied essentially correct *regulatory taking* analyses, those cases were analytically muddled by our preliminary consideration and recognition of the subject statutes as valid exercises of the States "police power." *See Highways*, 193 Mont. at 445-47, 632 P.2d at 335-36 (citing *Ostermiller* and *McTaggart*); *Ostermiller*, 187 Mont. at 10-16, 608 P.2d at 493-96; *McTaggart*, 184 Mont. at 333-36, 602 P.2d at 995-97. *Highways*, *Ostermiller*, and *McTaggart* are thus further distinguishable and of no consequence here to the extent that they anomalously conflate

87

the Montana constitutional *taking* analysis with the rational basis standard of substantive due process review.

¶76 The erroneous nature of the Court's resort to comparative analysis of the subject public improvement as a valid exercise of government police power, Opinion, ¶ 24, is further evident and contradicted by our correct recognition in *Knight-Missoula* and *Knight-Billings* that the nature or purpose of a *taking* of private property as a valid exercise of government police power does not insulate or preclude the de facto condemnor from liability under Article II, Section 29 to justly compensate the owner for a *taking* of private property for public use. *See Knight-Missoula*, 252 Mont. at 242, 827 P.2d at 1276 (citing *Knight-Billings*); *Knight-Billings*, 197 Mont. at 171, 642 P.2d at 144. *See similarly McTaggart*, 184 Mont. at 333-36, 602 P.2d at 995-97 (holding that subject statute was a valid exercise of police power but nonetheless effected a constitutional *taking* requiring just compensation). Thus, the Court's introduction in Opinion, ¶ 24, of the relative validity of the subject *taking* or *damaging* as an exercise of government police power has no bearing on whether the government action effected a constitutional *taking* or *damaging* requiring just compensation under Article II, Section 29.

6. Application of Correct Consequential *Damaging* Elements Here.

¶77 Based on a correct statement of the essential elements of a consequential *damaging* inverse condemnation claim (substantial physical damage or interference to or with private property, caused by the construction or operation of a public improvement or land use, property damage or interference uncommon to the public or community at large, and actual

88

pecuniary loss), with the causation element determined in accordance with our *Busta*-clarified standard encompassing causation-in-fact and, as applicable, reasonable foreseeability of harm and independent intervening causation, I would hold that there is no genuine issue of material fact on the Rule 56 record regarding the following facts on the essential elements of Wittmans' consequential damaging inverse condemnation claim: (1) the City of Billings sewer system is a public improvement installed and operating, in pertinent part, underground adjacent to the Wittmans' property; (2) the Wittmans sustained substantial private property damage resulting from the backflow of raw sewage into their home from the adjacent City sewer main; (3) the City sewer system, as currently designed and operated, helped produce in a natural and continuous sequence, in conjunction with the common grease discharge practices of its users, the subject grease accumulation and sewer main clog, sewage backflow, and property damage at issue, none of which would have occurred without the system as currently designed and operated; and (4) the subject property damage or interference is of a type or extent uncommon to the deleterious effect to which the City sewer system commonly subjects the public or community at large. To the extent that the City asserts that the chain of sequential causation-in-fact, and resulting City liability, should be truncated and precluded as a matter of law based on pertinent public policy considerations, I would further hold, as a threshold matter of law, that pertinent public policy considerations do not warrant truncation of City liability as a matter of law in this case because:

> (1)     it is beyond genuine material dispute on the Rule 56 factual record here that the flushing and accumulation of grease in the City sewer system is a

common, inevitable, and thus reasonably foreseeable occurrence attendant with the system as currently designed, built, operated, and regulated by the City;

(2)     it is similarly beyond genuine material dispute that sewage backflows and resulting private property damage, similar to what occurred here, occur on average 10-15 times per year as a result of the current non-tortious design, operation, and regulation of the system and the common, and thus reasonably foreseeable, grease discharge practices of system users;

(3)     the City has presented no evidence that would support a conclusion that the imposition of liability here, or in a similar case, would substantially increase its costs or liability to such extent to impede or prevent the continued economical provision of a quality sewer system and service to City residents and users; and

(4)     under these and similar circumstances, the City and its taxpayers, who are both the collective beneficiaries of the system and those collectively responsible for the undesirable grease flushing that is the precipitating contributing cause of this type of occasional sewage backflow onto private property, are more fairly and readily able to pay, with significantly less hardship than the relatively small number of affected individual private property owners, for the property damage caused by the relatively few number of city sewage backflows that damage private property in the City of Billings each year.

¶78     I thus dissent from the Court's unprecedented restriction of the fundamental Montana constitutional right to just compensation for private property consequentially *damaged* by public improvements or land uses. The Court's scattershot construction further muddles our inverse condemnation jurisprudence and effectively eviscerates and renders meaningless the broader consequential *damaging* protection of private property heretofore guaranteed by the Montana Constitution. In accordance with the foregoing analysis, I would reverse and remand for further proceedings, namely, for trial to determine

the extent of actual pecuniary loss incurred by the Wittmans as a result of the subject raw sewage backflow into their home.

/S/ DIRK M. SANDEFUR

Justice Ingrid Gustafson joins in the dissenting Opinion of Justice Sandefur.

/S/ INGRID GUSTAFSON